### UNITED STATES v. MOORE et al.

(District Court, S. D. New York. October 27, 1920.)

**Monopolies ⊂⇒9—Payment of brokerage fees by steamship companies not interstate or foreign commerce.**

The payment by steamship companies of commissions or brokerage fees on shipments secured through freight brokers, who act as agents for shippers is not interstate or foreign commerce, and an indictment against steamship companies doing business through the port of New York and members of the Steamship Freight Brokers' Association charging a conspiracy in restraint of interstate and foreign commerce, based on an alleged agreement that the steamship companies will allow a brokerage fee only to members of the association, which is limited in numbers, but which does not allege that the steamship companies refuse shipments from any other broker or shipper, or that there is any agreement restraining competition in rates, *held* not to charge any offense under the Sherman Anti-Trust Act, § 3 (Comp. St. § 8822).

Criminal prosecution by the United States against Walter Moore and others. On demurrer to indictment. Demurrer sustained.

Francis G. Caffey, U. S. Atty., of New York City (Henry A. Guiler and Rush H. Williamson, Sp. Assts. U. S. Atty., both of New York City, and Ryland W. Joyce, Sp. Asst. U. S. Atty., of Washington, D. C., of counsel), for the United States.

Burlingham, Veeder, Masten & Fearey, Bullowa & Bullowa, Kirlin, Woolsey, Campbell, Hickox & Keating, Coudert Bros., Duncan & Mount, Gilbert & Gilbert, Haight, Sandford, Smith & Griffin, Har-

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

rington, Bigham & Englar, Louis Hess, Lord, Day & Lord, Hunt, Hill & Betts, Loomis, Barrett & Jones, Noble, Morgan & Scammell; and Joseph P. Nolan, all of New York City (Van Vechten Veeder, A. S. Gilbert, and Vine H. Smith, all of New York City, of counsel), for defendants.

MAYER, District Judge. The indictment contains two counts; the first charging conspiracy from January 1, 1917, to restrain, and the second charging conspiracy to monopolize, trade and commerce, contrary to the so-called Sherman Anti-Trust Law (26 Stat. 209).

The second count is entirely devoid of merit, and fails upon any theory, to set forth facts sufficient to constitute a crime. It was disposed of on the argument and further reference to that count is unnecessary.

The first count of the indictment, when stripped of formal allegations and allegations, immaterial to the basic questions to be decided, comes down to a very narrow compass and a very modest set of fractions. It is alleged that 50 per cent. of the foreign trade and commerce, which was, or becomes in due course of business, interstate trade or commerce, moves to or passes through the port of New York; that 30 per cent. of this 50 per cent. is handled by freight brokers and forwarders; that of the said 30 per cent., upwards of 80 per cent., is handled by about 75 freight brokers and forwarders, who are members of an association known as the Steamship Freight Brokers' Association, and that practically all of the 50 per cent. of the foreign trade and commerce, above referred to, is transported by the steamship companies who are made the defendants. In other words, the freight brokers or forwarders, who are denounced by the indictment, handle 12 per cent. of the foreign trade and commerce to and from the United States and 24 per cent. of the commerce passing through the port of New York. The first figure is readily arrived at by taking 30 per cent. of 50 per cent., which is 15 per cent. and then 80 per cent. of 15 per cent., which is 12 per cent.; the second, then, is 24 per cent.

The defendants are 38 steamship lines, four corporations which are members of the Steamship Freight Brokers' Association, 17 individual defendants, who are described as being either officers or agents of the steamship companies or officers or members of the Steamship Freight Brokers' Association. After the allegations, usual and familiar in such indictments, the indictment sets forth " the divers means and methods, among others, by which objects of said conspiracy were intended by the defendants to be, and were to be, accomplished." Some of these alleged "means and methods" convey no information. Thus, the allegation, "holding meetings of representatives of virtually all of defendant steamship companies, the most important of which are members of the said Trans-Atlantic Associated Freight Conferences, and all the principal freight brokers or forwarders at the port of New York, members of said Steamship Freight Brokers' Association," means nothing.

It is unnecessary, in prosecutions under the Sherman Act, to allege overt acts, and therefore allegations of fact must go to the very substance of the charge. Referring to holding meetings, as quoted supra,

the indictment might just as well have alleged that the defendants were members of a social club, a business association, or a political party. The court has no judicial knowledge as to the Trans-Atlantic Associated Freight Conferences, nor any knowledge of its transactions. There is not a single allegation showing any restraint of trade or commerce, either interstate or with foreign nations, or conspiracy so to restrain, unless it be unlawful for the steamship companies concerned to limit the number of brokers to whom they will pay commissions or a so-called brokerage fee.

There is an allegation which might be worth considering, if it meant what a hurried reading might suggest, and that is the allegation as to "agreeing that the freight rates offered or quoted by the authorized agents of the said steamship companies should be observed, adhered to, and maintained." What this amounts to, as may be readily ascertained from the context, and, as was frankly admitted by counsel for the government on the argument, is this: That the defendants have agreed that, if steamship company A fixes a price of $1 per ton for a certain class of freight, then the brokers or forwarders who are members of the Steamship Freight Brokers' Association shall not sell that cargo space for more or less than $1 per ton. The same applies to steamship company B, or steamship company C, or the rest of the alphabet.

There is no suggestion—and this was also frankly admitted upon the argument by counsel for the government—that these defendants, or any of them, have any agreement involving a control of freight rates or their price in any manner, shape, or form. Steamship Company A may charge $1 per ton for a certain class of freight, if it pleases, and steamship company B may charge 95 cents per ton for the same class of freight. As to freight rates, the steamship companies, so far as the indictment discloses, are entirely free to indulge in the sharpest competition. The restriction upon the freight brokers is obviously intended to prevent them from speculating in freight accommodations at the expense of the shipper, and to prevent one shipper from getting space on the same vessel for less than another, or, per contra, from one shipper being charged more than another. Such a result, so far as affects shippers, calls for approval rather than indictment.

With these allegations thus disposed of, what the indictment, when read most favorably to the government, comes down to is this: That the steamship companies named have agreed that they will allow a brokerage fee only to the members of the Steamship Freight Brokers' Association, and that the membership of this association is limited, and that as a necessary consequence the steamship companies refuse to allow a brokerage fee to anybody but members of the Steamship Freight Brokers' Association. There is no suggestion in the indictment that this is a device for rebates, or underhand or discriminatory transactions, but, on the contrary, it affirmatively appears that no member of the Steamship Freight Brokers' Association shall divide his brokerage with any person other than a fellow member of the association, or, in other words, that he shall not divide his brokerage, either with the steamship company or with the shipper.

Counsel both for the government and the defense agree that the

broker is the agent of the shipper, and not of the steamship company. The question, then, is whether the payment by the steamship companies of a commission or brokerage fee is foreign or interstate trade and commerce, within the meaning of the Sherman Anti-Trust Law. Brokerage, by whomsoever paid, is merely an aid or facility whereby shipment may be more easily and readily accomplished. It is in no sense interstate or foreign trade or commerce.

In McCall v. California, 136 U. S. 104, 10 Sup. Ct. 881, 34 L. Ed. 391; the railway agent was employed in soliciting passenger traffic for his road. Being the agent of the carrier, acting solely on its behalf, he was engaged in interstate commerce. In the case at bar, however, the broker, so called, is the agent of the shipper. There is no allegation that the steamship company has refused freight from any source or at a different rate, whether from the shipper direct or from a person not a member of the Steamship Freight Brokers' Association. The sole allegation, in effect, is that no agent of a shipper, other than a member of the Steamship Freight Brokers' Association has received or will receive a brokerage fee. In order to sustain this count of the indictment it must appear that the business in which the members of the Steamship Freight Brokers' Association are engaged constitutes interstate trade or commerce. That it does not would seem to be apparent without a citation of authority; but it is well enough to refer by way of analogy to Engel v. O'Malley, 219 U. S. 128, 31 Sup. Ct. 190, 55 L. Ed. 128, Hopkins v. U. S., 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, Blumenstock Bros. Advertising Agency v. Curtis Publishing Co., 252 U. S. 436, 40 Sup. Ct. 385, 64 L. Ed. 649, and particularly to the opinion of Judge Augustus N. Hand in Sullivan v. Associated Billposters and Distributors of the United States (D. C.) 272 Fed. 323, filed September 30, 1919.

Further elaboration is unnecessary; for it is quite clear for the reasons outlined (and more could be stated, if necessary) and on the principles considered in the cases cited (and more could be added, if necessary) that the first count fails to set forth facts constituting a crime.

The demurrer is therefore sustained in all respects, and an order in accordance herewith may be submitted on five days' notice.