### VITAL et al. v. KERR.*

### BIGIO v. SAME.

(Circuit Court of Appeals, Second Circuit. February 4, 1924.)

Nos. 85, 86.

1. **Admiralty ⬤⇒68—Language of exhibit supersedes conclusions alleged.**
Where there is an allegation in a pleading as to the legal effect of a written instrument, and the written instrument is itself attached to the pleading, the language of the written instrument itself supersedes the pleader's conclusions, either of fact or of law.

2. **Carriers ⬤⇒177(3)—Liability of initial carrier stated.**
In the absence of statute or any contract or usage to the contrary, or any partnership agreement between connecting carriers or joint contract for transportation, the liability of the initial carrier, although the goods are marked for a point beyond its line, terminates when it transports the goods to the end of its line and delivers to a connecting carrier, to be transported to destination.

3. **Shipping ⬤⇒103—Statute amending Interstate Commerce Act, held immaterial as to foreign shipment.**
Act June 29, 1906, amending Interstate Commerce Act Feb. 4, 1887 (Comp. St. § 8563 et seq.), does not affect the liability as between connecting carriers, where the shipment was from outside the United States to a foreign country, and simply involved a transshipment at New York, without any carriage of the goods from one state through another state of the United States.

4. **Shipping ⬤⇒132(5)—Steamship line held not to have authorized another line to act as agent in making contracts.**
In suit for damages for failure to transport shipments, evidence, including writings, *held* not to show that respondent authorized another steamship line to enter into contracts of shipment in its behalf.

5. **Shipping ⬤⇒112—Subcontracting steamship line held not liable to shipper.**
Where steamship line from Haiti to New York controlled routing of coffee under contract with shipper, a line from New York to Europe in carrying shipments acted only as a subcontractor, and was not liable to a shipper for damages for failure to transport from New York.

6. **Shipping ⬤⇒112—Payment of freight brokerage not inconsistent with view that no agency existed.**
The fact that a steamship line from New York to Europe paid freight brokerage to a steamship line from Haiti to New York was not inconsistent with the view that the line from Haiti was the agent of a shipper from Haiti, and not an agent of the steamship company.

7. **Evidence ⬤⇒448—Acts and declarations of parties not shown to prove meaning of clear contract.**
Where a contract is in writing, and is clear and definite in its terms, the acts and declarations of the parties cannot be shown to prove that the contract means something different from what it states.

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Certiorari denied 44 Sup. Ct. 637, 68 L. Ed. ——.

8. **Contracts** ⊨170(1)—**Interpretation by parties admissible in construction of ambiguous contract.**

 Where the meaning of a written contract is not clearly apparent on its face, but is more or less ambiguous, the interpretation given to it by the parties themselves, as shown by their acts, will be adopted by the court, and to this end not only the acts but the declarations, of the parties may be considered.

9. **Principal and agent** ⊨48—**Agency presumes degree of subordination.**

 Agency presumes a degree of subordination on the part of an agent to the principal.

10. **Principal and agent** ⊨145(2)—**Action lies against undisclosed principal on agent's contract.**

 Where an agent makes a contract for an undisclosed principal, a right of action exists against the principal, although its name in no way appears on the face of the contract.

11. **Principal and agent** ⊨145(2)—**Undisclosed principal liable, whether contract in writing or merely oral.**

 If the contract is not under seal, an undisclosed principal is liable, whether the contract is in writing or merely oral.

12. **Principal and agent** ⊨23(1)—**Agency must be shown by satisfactory evidence.**

 In actions involving liability of undisclosed principals, the fact of the agency must be shown by satisfactory evidence.

13. **Principal and agent** ⊨99—**In absence of agent with authority, there is no principal.**

 If there is no agent with authority, express or implied, there can be no principal whom he represents, and whose business he transacts or manages.

 Manton, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Southern District of New York.

Libels by Emile Vital, Louis Vital, and Alexandre Vital, copartners trading under the firm name and style of J. B. Vital, and by Isaac J. Bigio, respectively, against Henry F. Kerr. Decrees for respondent, and libelants appeal. Affirmed.

Bigham, Englar & Jones, of New York City (T. Catesby Jones, Stephen P. Anderton, Vine H. Smith, and James W. Ryan, all of New York City, of counsel), for appellants.

Herman Goldman, of New York City (Benjamin Reass, of New York City, and Harry G. Liese, of Brooklyn, N. Y., of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. These suits were tried together and were decided in a single opinion, disposing of them upon a common ground. They will be determined in this court also in one opinion.

The suits were brought to recover for an alleged breach of contract. The contracts involved covered all shipments of the Haitian coffee crop of 1916 and 1917. The libelants in both cases resided in the republic of Haiti and were exporters of coffee. The chief market for Haitian coffee was in France, and to a less extent in Spain and Italy. In the United States there was no profitable market for that kind of coffee. In 1916 there was no direct transportation from Haiti to France, and

---

⊨For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the principal commercial route for the shipment of Haitian coffees to the European continent was via New York, involving transshipment here to the transatlantic carrier. The respondent operated a line of steamships from New York to Havre, Bordeaux, Marseilles, and Barcelona, but had no line to Haiti. The Dutch Line operated steamships between Haiti and New York, but none to France.

The libels in effect averred that the libelants, who are exporters of coffee from Haiti, made contracts with the respondent through the agency of the Royal Dutch West India Mail Steamship Company, hereinafter called the Dutch Line, and the latter company's agents, Funch, Edye & Co., whereby the respondent agreed to receive at New York certain shipments of coffee and to transport the same either to Havre or to Bordeaux, France, at the fixed rate of $1.65 net per 100 English pounds; that pursuant to the agreement the libelants shipped the coffee from certain places in Haiti to New York, and that on its arrival in New York it was tendered to the respondent for carriage to Havre; and that the latter refused to carry the coffee and the libelants were therefore compelled to forward the same to its destination by a steamship operated by other persons, at a heavy loss to the libelants. Six distinct causes of action are set up in the libel in the first suit, and the aggregate amount of the damages alleged in that suit is $60,500.

In the second suit the contract alleged that the freight rate was also $1.65 per 100 pounds; the coffee was also to be carried from New York to Havre, or to Marseilles, France. The coffee was tendered and refused, and the libelant was obliged to ship by another line to his damage. Six distinct causes of action are alleged in the second suit, and the aggregate amount of the damages alleged in this suit is $49,-248.46; and the aggregate amount of the damages in the two suits is thus $109,748.46.

Prior to the trial the libelants served notice that they desired to substitute the sum of $65,000 for the sum of $60,500 as the amount of the damages claimed in the first suit, and in the second suit a like notice was given of a desire to increase the amount of the damage claimed by $6,996.42. This would make the demands aggregate $121,-244.88, instead of $109,748.46. The District Judge dismissed the libel in both suits, because he held that the libelants had no contract relations with the respondent.

The appellants claim that in the first of these suits the original answer admits the allegation in the third paragraph of the libel. That paragraph is found in the margin.[1] The answer thereto is also in

[1] "Third. On October 24, 1916, Funch, Edye & Co., as agents of the Royal Dutch West India Mail Steamship Company, entered into an oral agreement with the respondent, trading as the Kerr Steamship Line, whereby the respondent authorized the said Royal Dutch West India Mail Steamship Company to make contracts in Hayti with various exporters of coffee in Hayti for the carriage of coffee by the said Kerr Steamship Line from New York to Harve, Bordeaux, Marseilles, and/or Barcelona at the rate of $1.65 per 100 pounds freight either to be prepaid or freight and charges to go forward collect at the option of Messrs. Funch, Edye & Co. The agreement was to commence on October 24, 1916, and was to stay in force until the end of May, 1917. Subsequently this agreement was confirmed by letters which passed be-

the margin.[2]  It is claimed that this is an admission of the agency.
Paragraph third alleges as a legal conclusion that authority was grant-
ed to the Dutch Line; but it alleges that all of the legal conclusions
rest upon the letter of October 24, 1916, which is annexed as an ex-
hibit.

[1] It is, however, a fundamental rule of pleading that where there
is an allegation in a pleading as to the legal effect of a written instru-
ment, and the written instrument is itself attached to the pleading,
the language of the written instrument itself entirely supersedes the
conclusions either of fact or of law as they have been pleaded.  Gosse-
lin Corporation v. Mario Tapperelli fu Pietro of America, Inc., 191
App. Div. 580, 181 Supp. 883; Rubin v. Siegel, 188 App. Div. 636,
638, 177 Supp. 342.  The admission amounts to nothing more than
that the letter of October 24, 1916, was sent by Funch, Edye & Co.
to the respondent; for, if there is a variance between the allegations
of the complaint and the written instrument attached which is relied
upon as disclosing the terms of the contract, the court must disregard
the allegations as to the legal effect of the contract, and resort to the
contract itself as if it had been set forth in the body of the complaint
in extenso.  The admission in the answer admits the existence of the
letter, but does not admit the conclusion of the pleader as to its legal
effect.

In the second suit the question above considered does not arise, as
in that case the answer is more specific.  In that case the answer re-
ferring to the third paragraph of the libel may also be found in the
margin.[3]  But as respects the first suit it is, for the reason already
stated, necessary to scrutinize carefully the letter of October 24, 1916,
annexed to and made a part of the libel.  It is as follows:

"October 24, 1916.
"Messrs. Kerr Steamship Co., 17 Battery Place, New York City—Dear Sirs:
We confirm arrangement made with your Mr. Quick, for transportation via
your service of any and all coffee coming from Hayti, over which we
control the routing for Harve, Bordeaux, Marseilles, and/or Barcelona at
the rate of $1.65 per 100 pounds, freight either to be prepaid or freight and
charges to go forward collect at our option.

"Freight to be delivered alongside your steamer at our expense, and you
agree to take delivery of the same on your dock at any time.  This agreement
to commence at once and to stay in force, say, until the end of May; i. e.,
pending the movement of the present coffee crop.  And whilst it is under-
stood we guarantee no minimum quantity, we in turn agree to route via your
service shipments which, as mentioned above, we may control.

"As the weight on coffee is at times estimated, it is understood that, where
the shippers produce a certified weight certificate, you will join with us in re-
funding your share of ocean freight should there be an overcharge.

---

tween the Kerr Steamship Line and Messrs. Funch, Edye & Co., as ap-
pears by Exhibits A, B, and C annexed hereto, and which are hereby made
a part of this libel."

[2]"Third.  Admits that he received a letter, a copy of which is attached to
this answer and marked Exhibit I.  Except as so admitted, he denies each
and every allegation contained in the fifth article of the libel."

[3]"He admits that he received a letter, a copy of which is attached to this
answer and marked Exhibit 1.  Except as so admitted, he denies on informa-
tion and belief each and every allegation in the fourth subdivision of the libel
contained."

"A freight brokerage of 1¼ per cent. is to be paid Funch, Edye & Co. for account of the Royal Dutch West India Mail.

"Mr. Jonker, the resident inspector in Hayti of the Dutch Line, has been advised of the above arrangement, and sailed recently for Hayti, where he will try to work up business to move on the above basis.

"We ask you to kindly confirm the above understanding and remain,

"Yours very truly,            Funch, Edye & Co., per * * *."

In reply to the above letter the respondent wrote as follows:

"Kerr Steamship Line, New York.

"November 1, 1916.

"Messrs. Funch, Edye & Co., 8 Bridge Street, New York City—Dear Sirs: We beg to acknowledge receipt of your favors of the 24th and 31st ultimo, which outline the arrangement between us for the carrying to France and Barcelona of shipments of coffee from Hayti, the routing of which you control.

"Your understanding of our agreement is entirely in order, and we herewith have much pleasure in confirming the same.

"Yours faithfully,            Kerr Steamship Line, per ———."

By reason of the foregoing correspondence the resident inspector in Haiti of the Dutch Line circularized his agents in Haiti by sending to them the following communication:

"D. L. Jonker.

"Port au Prince, November 4, 1916.

"To the Agents of the Royal Dutch West India Mail, Haiti—Dear Sirs: I hereby beg to inform you that arrangements have been made by our company whereby, until further notice, coffee shipments to New York from Haitian ports by our steamers can be reforwarded from here to Harve and Bordeaux at an extra fixed rate of $1.65 net per 100 English pounds plus transshipment charges at New York estimated at about $0.10 per 100 English pounds.

"In order to properly attend to the reforwarding, Messrs. Funch, Edye & Co. wrote to me on October 20th that the following instructions have to be strictly adhered to:

"Bills of lading should *not* be consigned to Funch, Edye & Co., but 'to order, notify Funch, Edye & Co.' This will necessitate the forwarding to us of at least two indorsed negotiable bills of lading in order to make the necessary in transit entry.

"Either a consular invoice showing the ultimate destination or a notation on the bill of lading 'in transit to' is required.

"Instructions should be given in letter as to the disposition of the ocean bills of lading; i. e., the documents covering the cargo from New York to the ultimate destination. As freight is shipped to us on a local bill of lading, the instructions are required to show to whom the title is to be given. At the same time full instructions should be given regarding the insurance of the freight and cabling to consignees, if necessary, etc., etc.

"As we are handling these shipments as a matter of accommodation only, freight cannot be forwarded unless full remittance is in hand. We should be advised to whom to apply or whether we are to cable the shippers for the funds.

"Kindly acknowledge receipt of this letter and oblige.

"Yours very truly,            D. L. Jonker."

The libelants testified that they received the Jonker letter of November 4, 1916, above set forth. They have filed the libels upon the ground that they shipped coffee from Haiti to New York by the Dutch Line, and that the Kerr Line, the respondent, refused to carry the coffee from New York to France. The libels proceed upon the theory that the Dutch Line took the coffee under an agreement to have it reforwarded from New York to France by the Kerr Line, for which it was acting as agents in making the agreement.

The bills of lading issued in Haiti in both these suits were issued by the Dutch Line, and they called for the delivery of the coffee in New York to the order of Funch, Edye & Co., and their name as. agents of that line at New York is printed on the margin of the bills. If the bills of lading had been issued for the carriage of the goods from Haiti to France, and required the goods to be transshipped at New York and to be carried from New York to France by the Kerr Line, the question presented would be quite different from the one now before the court. In such a case we should be compelled to inquire as to the authority of the Dutch Line to issue such a bill of lading.

[2] In England and in Canada, if a carrier receives goods marked to a destination beyond its usual line of transportation, so that for final delivery at the place of destination it is necessary that the goods should be transported by a connecting carrier, the courts in such cases hold that, if there is no express agreement to the contrary, the carrier first receiving the goods becomes liable as carrier for the entire transportation. Watson v. Ambergate, etc., R. Co., 15 Jur. 448, 3 Eng. L. & Eq. 497; Muscamp v. Lancaster, etc., R. Co., 8 M. & W. 421; Northern Pac. R. Co. v. Grant, 24 Can. S. C. 546. But in the United States, in the federal courts, this doctrine has not prevailed. In this country the rule of the federal courts is that, in the absence of statute or any contract or usage to the contrary, or any partnership agreement between connecting carriers or joint contract for transportation, the liability of the initial carrier, although the goods are marked for a point beyond its line, terminates when it transports the goods to the end of its line and delivers them to a connecting carrier, to be transported to their destination. Oregon-Washington Railroad & Navigation Company v. McGinn, 258 U. S. 409, 413, 42 Sup. Ct. 332, 66 L. Ed. 689; Michigan Central R. Co. v. Myrick, 107 U. S. 102, 1 Sup. Ct. 425, 27 L. Ed. 325; St. Louis Ins. Co. v. St. Louis, etc., R. Co., 104 U. S. 146, 26 L. Ed. 679; Michigan Central R. Co. v. Mineral Springs Mfg. Co., 16 Wall. 318, 21 L. Ed. 297; Cincinnati, etc., R. Co. v. Fairbanks, 90 Fed. 467, 33 C. C. A. 611; Stewart v. Terre Haute, etc., R. Co. (C. C.) 3 Fed. 768; Dixon v. Columbus, etc., R. Co., 4 Biss. 137, 7 Fed. Cas. 751, No. 3,929; Quillen v. Minneapolis & St. Louis R. Co., 181 Iowa, 536, 164 N. W. 779; Louisville & N. R. Co. v. Johnson, 182 Ky. 418, 206 S. W 638; Price v. Southern Railroad Company, 173 N. C. 394, 92 S. E. 182.

[3] And we need not inquire to what extent, if any, the Act of June 29, 1906, amending the Interstate Commerce Act of February 4, 1887 (Comp. St. § 8563 et seq.), would affect the liability of the parties where the shipment was from outside the United States to a foreign country and simply involved a transshipment at New York, without any carriage of the goods from one state through another state of the United States.

[4] It is to be noted that there is nothing in the record to show that the Kerr Line at any time, by any written agreement, or by any oral one, expressly authorized the Dutch Line to act as agent for the respondent. If any such agency existed, it must be one implied from the conduct of the parties, and inferred from the language of the let-

ter of October 24, 1916, and that of November 1, 1916, which acknowledged its receipt and confirmed it.

But we find nothing in the letter of October 24, 1916, which constituted the Dutch Line the agent of the Kerr Line, or which established an agency in favor of the writer of the letter on behalf of its addressee. It is a letter written by the agents of the Dutch Line, which contemplated arranging with the Haitian coffee shippers to carry their coffee from Haiti to France via New York, and addressed to a transatlantic carrier which it desired to employ to perform the last leg of the voyage. The Dutch Line intended an engagement with coffee shippers on its own behalf, and desired for its own assurance as to the cost to themselves of transatlantic carriage, as it operated no steamships in that service. The letter of October 24, 1916, is, so far as the sender and recipient of the letter are concerned, an arrangement between the Dutch Line as the shipper and the Kerr Line as the carrier. The Dutch Line agreed to ship over the Kerr Line the coffee, the routing of which it controlled, and the Kerr Line agreed to carry such coffee for the Dutch Line. Whether this agreement amounted to a legal contract as between the Dutch Line and the Kerr Line, because there was no promise by the former to ship any fixed and definite amount of the coffee over the latter line, we are not now concerned to inquire. It certainly did not establish a contract between these libelants and the respondent.

[5] An examination of the letter of October 24, 1916, discloses that the arrangement made related to the transportation over the Kerr Line "of any and all coffee coming from Haiti, over which we [the Dutch Line] control the routing." The coffee over which the Dutch Line did not control the routing clearly was not involved. It is alleged in the libels that the Dutch Line controlled the routing of the coffee of the libelants. If the Dutch Line had a right to control the routing of the libelants' coffee its right must have been derived from contract. The respondents claim this first letter shows that it is the indisputable inference from this first sentence that the Dutch Line had or contemplated that it would have a contract for the shipment of this coffee to France, and that by such contract, existing or contemplated, the Dutch Line agreed or would agree to transport that coffee to France. For that service it employed the Kerr Line its subcontractor.

And it is further claimed that the first paragraph of the letter indicates the Dutch Line as the shipper, inasmuch as it provides that the freight was to be prepaid or go forwarded collect at the Royal Dutch Line's option; the option not being reserved to the owners of the coffee who might ship it.

Then in the second paragraph of the letter the Dutch Line imposed the duty upon the Kerr Line to accept the coffee "at any time" and the coffee was to be delivered alongside the Kerr Line's "steamer at our [the Dutch Line's] expense." Such provisions would not be expected in a communication from an agent to one about to become his principal.

Whatever obligation, if any, was created as to the shipping of the coffee by the Kerr Line, was the obligation of the Dutch Line. It

imposed no obligation against other owners of Haitian coffee. If the Dutch Line breached the agreement to ship over the Kerr Line, and sent coffee forward by some other line, the Kerr Line obviously would have had no recourse against the Vitals, or Bigio, or any owner of Haitian coffee other than the Dutch Line. Assuming that the correspondence created a legal obligation, it certainly imposed none upon these libelants.

The third paragraph of the letter is also significant. It recognizes the fact that weight on the coffee is many times estimated, and then provides that if, at a later time, the shippers produce a certified weight certificate, the Kerr Line will join the Dutch Line in refunding the Kerr Line's share of the ocean freight, should there be an overcharge. If it was contemplated that there would have been any agreement whatsoever between the Kerr Line and individual shippers, other than the Dutch Line, such a provision would have been needless, as the shippers would have had their recourse in such an event directly against the Kerr Line.

[6] This brings us to a consideration of the fourth paragraph, of the letter, which relates to freight brokerage. It provides that a freight brokerage of 1¼ per cent. is to be paid to the Dutch Line. The fact that such a commission is paid by the carrier to the freight broker is not inconsistent with the view that the latter is the agent of the shipper. All the details of the reforwarding of the coffee were performed by Funch, Edye & Co., acting for the Dutch Line. They attended to all of the work for the Haitian shippers which the freight brokers and forwarders regularly perform for their clients. The payment of such a commission does not show that the broker has authority to make general freight contracts for the shipping company. In United States v. Moore (D. C.) 275 Fed. 992, which was a criminal case, counsel for the government, as well as counsel for the defendants, agreed that the broker is the agent of the shipper and not of the steamship company, and we do not doubt that such is the case.

That portion of the first paragraph of the letter of October 24, now under consideration, is most strongly relied upon to show that a contract existed between the libelants and the Kerr Line. It is argued that in receiving this freight Funch, Edye & Co. must have received it as agents of the Kerr Line. If that be so, then there must have been an obligation on the part of Funch, Edye & Co., or of the Dutch Line, to have forwarded this coffee by the Kerr Line. But we find no promise made to the libelants by Funch, Edye & Co., or by the Dutch Line, which bound them to ship the coffee by the Kerr Line. The only promise was a promise by the Kerr Line to carry coffee furnished to it by Funch, Edye & Co., at the specified rate of freight, and also a promise by the latter to furnish to the respondents coffee, the routing of which they controlled. This record does not show that Funch, Edye & Co. was not left at liberty by the shippers to make any contract it chose for the carriage of the coffee to France. It was left a free hand, so far as libelants are concerned, to deal with the shippers upon its own terms and for its own profit and advantage. If it had seen fit to forward the coffee from New York to France by some

other line, and for a less freight or for a greater freight, the shippers could not have complained. The truth of the matter appears to be that 1¼ per cent. freight brokerage was paid to Funch, Edye & Co. as the *agent* of the *shipper* for forwarding the coffee from New York to France and in effecting its transshipment at New York. Indeed the libelants so state in their brief when they say:

"It [the Dutch Line] or *its agents* here, Funch, Edye & Co., acted as forwarder for the Haitian shippers in effecting transshipment in New York to the respondent's line."

The contention now put forward is an illustration of what often happens, that a contracting party for some reason finds it to his interest not to sue the party with whom he made the direct contract, but to assert his claim against a third party, with whom he has made no direct contract, and this upon the contention that the person with whom he directly contracted was in some way the agent of the person sued.

The fifth paragraph in the letter relating to the working up of business by Mr. Jonker is merely a statement as to what the Dutch Line proposed to do in getting business to enable it to carry out its agreement with the Kerr Line. We see nothing in this statement, or any consent on the part of the Dutch Line, that its agent, Jonker, should make contracts binding on the Kerr Line.

We have thus examined, in much detail, the letter of October 24, 1916, and we confess ourselves to be utterly unable to find that it constituted the Dutch Line the agent of the Kerr Line, or that it conferred upon the subagents of the Dutch Line any right to make with shippers for and on behalf of the latter line contracts for carriage.

There is not disclosed in this record any written evidence of a contract made with the appellants in the name of the Kerr Line by the Dutch Line, or any agent or agents of that line, acting as the agent or agents of the Kerr Line. The conduct of the libelants prior to the bringing of these suits, and when they deemed themselves wronged by the failure to forward the coffee from New York to France, strongly indicates that they did not themselves understand that their contract was with the Kerr Line. They sent no protests to the Kerr Line. All their complaints were complaints against the Dutch Line and Funch, Edye & Co., the New York agents of that Line. The libelant Bigio came to New York from Haiti in July, 1917, for the express purpose of hastening the shipment of the coffee from New York to France; and he remained in New York from July to November. During the entire five months of his stay in New York, for no other purpose than to get this coffee to France, it never occurred to him that he ought to go to the Kerr Line, and he never went once to its office. It was not to the Kerr Line that he tendered the agreed freight of $1.65 per 100 pounds. The libelant Emile Vital also came to New York on the same business. His testimony shows that he made his protests and threats against the Dutch Line, and not against the Kerr Line. In a letter written by him in New York on August 9, 1917, and addressed to "Funch, Edye & Co., General Agents of the Royal Dutch West India Mail," he called attention to the long delay which had occurred in not forwarding the coffee from New York to France, the loss he was subjected to by the delay, and then continued:

*"I feel therefore entitled to protest against such poor handling of cargoes entrusted to your care as agents of the Dutch Line, and if you cannot bear on the Kerr Line to enforce the contract made with you, specially since said line had several sailings to French ports since the arrival of these lots of coffee here, I will see myself compelled to hold you responsible for all extra expenses involved by the long delays in the transshipment of these consignments. including the interests on advances taken on them, amounting to about $115,000."*

After that letter was written, Funch, Edye & Co., the agents for the Dutch Line, appear to have made it their business to convince Vital that his claim was not against their line, but against the Kerr Line. When an official connected with Funch, Edye & Co. was on the stand, he gave testimony as follows:

"Q. Will you say that it was not your purpose at that time to divert Vital from asserting claims against the Royal Dutch or Funch-Edye, and get him to assert this claim against the Kerr Company? A. That is an involved question.

. "Q. Will you say it was not your purpose to divert Vital from his intention? Was it not your purpose to divert Vital from his intention of asserting a claim against the Royal Dutch, or Funch, Edye & Co., so that he would assert it against the Kerr Company? A. No; I won't say that.

"Q. This must be clear to your mind, that Vital thought he had a claim against you in August, 1917? A. Yes; he thought so.

"Q. And you succeeded in persuading him that he did not have a claim against you, but, if anybody, it was against the Kerr Steamship Company? A. At a later date; yes, sir. ·

"Q. I state that substantially correct, don't I? A. Yes.

"Q. Wasn't it you that put the idea into his head that he had a contract with the Kerr Company, rather than with Funch, Edye & Co. or the Royal Dutch? A. Well, when was this that we put that idea into his head?

"Q. After August 9, 1917. ￼ A. After August; yes."

It was only after this idea was put into his head by the agents of the Dutch Line that his claim was against the Kerr Line that it occurred to him to see that line, and it was an agent of the Dutch Line who accompanied him to the offices of the Kerr Line when he finally consented to go there with his complaints.

[7] Where a contract is in writing, and is clear and definite in its terms, the acts and declarations of the parties cannot be shown to prove that the contract means something different from what it states. C. H. Pope & Co. v. Bibb Mfg. Co. (D. C.) 290 Fed. 586; No Leak-O Piston Ring Co. v. Chandlee, 289 Fed. 526, 530, 53 App. D. C. 128.

[8] But where the meaning of a contract is not clearly apparent upon its face, but is more or less ambiguous, the interpretation given to the contract by the parties themselves, as shown by their acts, will be adopted by the court, and to this end not only the acts, but the declarations, of the parties may be considered. Bransford v. Regal Shoe Co., 237 Fed. 67, 150 C. C. A. 269; Bunday v. Huntington, 224 Fed. 847, 140 C. C. A. 415; Nelson v. Ohio Cultivator Co., 188 Fed. 620, 112 C. C. A. 394; Fitzgerald v. First National Bank, 114 Fed. 474, 52 C. C. A. 276; Williston on Contracts, vol. 2, § 623.

In Insurance Company v. Dutcher, 95 U. S. 273, 24 L. Ed. 410, the court declared that "the practical interpretation of an agreement by a party to it is always a consideration of great weight," and it·added:

"There is no surer way to find out what parties meant than to see what they have done." And see Carthage Tissue Paper Mills v. Carthage, 200 N. Y. 1, 93 N. E. 60; City of New York v. New York Central Railroad Co., 193 N. Y. 543, 86 N. E. 565.

[9] An examination of the record into the conduct of the parties discloses that neither the Dutch Line nor the Kerr Line regarded the relationship existing between them as that of principal and agent. Agency presumes a degree of subordination on the part of an agent to the principal. The agent does not dictate to the principal how the work must be done. But this is the very thing that Funch, Edye & Co. were at all times doing in regard to the Kerr Line. When Funch, Edye & Co. and the Dutch Line were threatened with suits because of the failure to send the coffee forward from New York to France, their conduct discloses for the first time that in some way the Kerr Line was liable to the shippers on the contracts they themselves had made with the shippers; the liability of the Kerr Line to the shippers being in some way derived from and dependent upon the alleged contract which was claimed to have been made between the Dutch Line and the Kerr Line because of the correspondence already considered. We have heretofore stated that no direct contract appears in the record between the parties to these suits.

[10-13] It is quite true that, where an agent makes a contract for an undisclosed principal, a right of action exists against the principal, although the latter's name in no way appears upon the face of the contract. While the rule of the common law is that an action can be brought upon a sealed contract only against those whose names appear therein, it is equally well established that, if the contract is not under seal, the undisclosed principal is liable, whether the contract is in writing or merely oral. Ford v. Williams, 21 How. 287, 16 L. Ed. 36. But in all such cases the fact of the agency must be shown by satisfactory evidence. If there is no agent with authority, express or implied, there can be no principal whom he represents, and whose business he transacts or manages; and as we read this record we fail to find anywhere therein authority expressly or impliedly conferred by the Kerr Line, the respondents herein, upon Funch, Edye & Co. to act as agents for that line. Funch, Edye & Co. do not appear to have held themselves out as agents for the Kerr Company, and the letters written by them have printed at the top in large type the words "Royal Dutch West India Mail," and some of them have directly thereunder, in equally large type, "Funch, Edye & Co., Agents." The record also discloses that the libelants Vital, in their correspondence with Funch, Edye & Co. concerning the transactions herein involved, address them as "General Agents of the Royal Dutch West India Mail." The Vitals commenced their suit in January, 1918, and as late as November 27, 1917, they were still addressing Funch, Edye & Co. as general agents of the Dutch Line. A careful examination of the record fails to disclose that any one of the libelants in either suit ever addressed Funch, Edye & Co. as the agents of the Kerr Line.

Decrees affirmed.

MANTON, Circuit Judge (dissenting). Because I cannot adopt the argument of the respondent which finds adoption in the prevailing opinion, I dissent. The letter of October 24, 1916, and the answer thereto of November 1, 1916, established an agency whereby the Dutch Line became the agent of the Kerr Line in Haiti. Funch, Edye & Co. were the agents of the Dutch Line in this country. The purpose of this agency was to solicit shippers to transport the coffee crop for the year 1916–1917—ending in May—from Haiti to New York, and thence to European points. The term of the contract was "pending the movement of the present coffee crop." The letter of November 4, 1916, written by the agent of the Dutch Line in Haiti, was sent to shippers there, and confirmed the arrangements made, and represented to the shippers that coffee could be sent through the Dutch Line's connecting ocean transportation company to European points. It set forth the rates and manner in which through transportation would be effected. It clearly appears that the Dutch Line represented the Kerr Line, and acted through its agents in Haiti in securing freight from shippers. The record satisfactorily demonstrates that the coffee in question, which was not transported and for breach of which this libel was filed, was of the crop of 1916–1917. It was solicited by agents and subagents of the Kerr Line in Haiti. The Dutch Line finished its transportation by carrying the coffee to New York, and, under the rule of law which is set forth correctly in the prevailing opinion, the connecting carrier having failed in its obligation to carry the freight forward, the obligation for the breach was with this connecting carrier. The agent in Haiti acted within the scope of the authority which was conferred upon him by the Kerr Line in the manner described. Through carriage was contemplated when the shipper delivered the freight to the Dutch Line, and the only arrangement that is disclosed for the transportation from New York to European points was through the Kerr Line. There was no revocation of agency, and there was direct representation that freight so received would be transported via the Kerr Line to European points.

Applying the principle adopted in the prevailing opinion as to the effect of the conduct of the parties in carrying out the contract after its execution, it will be noticed that the Kerr Line realized its obligation to the contract of through carriage. Letters written were pleas and requests to withhold shipments because of the congested condition in New York and inability to get ships. At no time did they revoke the authority of the Dutch Line. They provided for storage of the coffee in New York, and, indeed, throughout the letters seemed to desire the business, only asking to hold it in reserve. Their correspondence acknowledged that at all times they were under obligations to the shippers of the coffee, which they had agreed to carry and which they failed to transport. If we invoke the rule, and apply it, that the practical interpretation of an agreement by a party to it is always a consideration of great weight (Insurance Co. v. Dutcher, 95 U. S. 273, 24 L. Ed. 410), as it is applied in the prevailing opinion to this conduct of the parties, it is difficult to follow the reasoning that leads to the conclusion that the appellee did not regard himself as un-

der obligation to carry this freight. What the respective appellants did in endeavoring to seek redress after the contract was breached, as it is referred to in the prevailing opinion, might well have been induced by their lack of knowledge of the rule of law which attaches responsibilities upon the initial carrier and its connecting carriers.

Although the Dutch Line received the goods in Haiti under a local bill of lading for carriage to New York, the record establishes that it was definitely understood, at the time that the goods were shipped, that they were to be carried from New York to France by the Kerr Line. This clearly appears from the fact that in each case the bill of lading was transferred by the shipper to Funch, Edye & Co., agents for the Dutch Line, New York, with specific directions to forward to named consignees in France. The contemplated carriage of the coffee was for a continuous journey from Haiti to France. Indeed, the Kerr Line had theretofore carried to France 61,379 bags out of a total of 112,754 bags shipped under the same arrangement. The two steamship companies, by the letters referred to, had secured the transportation for Europe of the entire output of the coffee raised in Haiti for the year 1916–1917.

The decree below should be reversed.