## ACME FAST FREIGHT, Inc. v. CHICAGO, M., ST. P. & P. R. CO. et al.

No. 81, Docket 20756.

Circuit Court of Appeals, Second Circuit.

March 1, 1948.

Clark, Carr & Ellis, of New York City (Paul A. Crouch, of New York City, of counsel), for plaintiff.

Bleakley, Platt, Gilchrist & Walker, of White Plains, N. Y. (Joseph Walker, Roswell P. C. May and Dennis P. Donovan, all of New York City, of counsel), for Pennsylvania R. Co. and Loftin and Martin.

Thomas L. Ennis, of New York City, for Delaware & H. R. Co.

Rowland L. Davis, Jr., of New York City, for Chicago, M., St. P. & P. R. Co. and Delaware, La. & W. R. Co.

Pierce & Greer, of New York City (H. Brua Campbell, of New York City, of counsel), for Wabash R. Co.

Before SWAN, CHASE and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. This decision must turn on whether or not freight forwarders are to be considered receiving carriers under the conditions in this case for the purposes of Section 1013, 49 U.S.C.A.[2] and the Carmack Amendment, 49 U.S.C.A. § 20(11)[3] and

---

[2] Section 1013 reads: "Section 1013. Bills of lading and delivery of property. The provisions of section 20(11) and (12) of this title, together with such other provisions of chapter 1 of this title (including penalties) as may be necessary for the enforcement of such provisions, shall apply with respect to freight forwarders, in the case of service subject to this chapter, with like force and effect as in the case of those persons to which such provisions are specifically applicable, and the freight forwarder shall be deemed both the receiving and delivering transportation company for the purposes of such section 20(11) and (12). When the services of a common carrier by motor vehicle subject to chapter 8 of this title are utilized by a freight forwarder for the receiving of property from a consignor in service subject to this chapter, such carrier may, with the consent of the freight forwarder, execute the bill of lading or shipping receipt for the freight forwarder. When the services of a common carrier by motor vehicle subject to chapter 8 of this title are utilized by a freight forwarder for the delivery of property to the consignee named in the freight forwarder's bill of lading, shipping receipt, or freight bill, the property may, with the consent of the freight forwarder, be delivered on the freight bill, and receipted for on the delivery receipt, of the freight forwarder."

[3] So far as here pertinent, Section 20(11) provides: "Section 20, par. (11) Liability of initial carrier for loss; limitation of liability; notice and filing of claim. Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation [in interstate commerce] * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, * * *

20(12).[4]  Prior to the enactment in 1942 of Part IV of the Interstate Commerce Act regulating freight forwarders, they were for most purposes considered shippers, not carriers,[5] although their liability to their customers was the same as that of a carrier.[6]  We agree with appellees that the general effect of that legislation was not to make carriers of such forwarders. The Act defines a freight forwarder as one who "holds itself out to the general public to transport or provide transportation of property," and "utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers."[7]  Forwarders are nowhere referred to in the Act as carriers. The purpose of the legislation was obviously to subject freight forwarders to regulation, from which they had previously been exempt, particularly with regard to their rates, in order to prevent their discrimination among individual shippers and among railroads, and to establish more reasonable competition as between railroads, forwarders, motor-carriers and other transportation agencies.[8] To subject forwarders to the control of the Interstate Commerce Commission it was not necessary to make them into carriers, and indeed, in view of their operations, it would have been a strange linguistic feat for Congress to have done so.

▇ Nevertheless, we think that when Congress said in Section 1013 that, for the purposes of Section 20(11) and (12), a "freight forwarder shall be deemed both the receiving and delivering transportation company," it meant that for the limited purposes of that section a forwarder is to be treated as a carrier. From the language of the Act, such construction strikes us as both obvious and reasonable. While it would not square with reality to consider a freight forwarder a carrier for all purposes, neither would it be reasonable, in an Act which itself distinguishes forwarders from individual shippers, to treat a forwarder in all respects like any other shipper. Moreover, as forwarders already had a common-law liability similar to the common-law liability of a carrier, it would appear reasonable for Congress to treat them as carriers for the purposes of statutory subrogation provisions which modify that carrier liability.

2. Appellees argue that, even if appellant has the status of a carrier under Section 1013, they are not "connecting carriers" liable to the forwarders as initial carriers under section 20(12), because appel-

---

and any such common carrier, railroad, or transportation company so receiving property for transportation * * * shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not * * * Provided further, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law * * *."

4 Section 20(12) provides: "§ 20, par. (12) Recovery by initial carrier from connecting carrier. The common carrier, railroad, or transportation company issuing such receipt or bill of lading, or delivering such property so received and transported shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

5 Interstate Commerce Commission v. Delaware, L. & W. R. Co., 220 U.S. 235,

31 S.Ct. 392, 55 L.Ed. 448; Great Northern Ry. Co. v. O'Connor, 232 U.S. 508, 509, 34 S.Ct. 380, 58 L.Ed. 703; Lehigh Valley R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839.

6 See Kettenhofen v. Globe Transfer & Storage Co., 70 Wash. 645, 127 P. 295, 42 L.R.A.,N.S., 902, Ann.Cas.1914B, 776; Slutzkin v. Gerhard & Hey, Inc., 199 App. Div. 5, 14, 191 N.Y.S. 104, 110; Highway Freight Forwarding Co. v. Public Service Commission, 108 Pa.Super. 178, 164 A. 835; Acme Fast Freight, Inc. v. United States, D.C.S.D.N.Y., 30 F.Supp. 968, 973, affirmed 309 U.S. 638, 66 S.Ct. 810, 84 L.Ed. 993.

7 49 U.S.C.A. § 1002(a) (5).

8 The need for such regulation became imperative when the courts sustained the Interstate Commerce Commission in holding that forwarders were not subject to the Motor Carrier Act of 1935, 49 U.S. C.A. § 301 et seq. or as express companies to Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. and that their joint rates with motor carriers were unlawful. Acme Fast Freight, Inc. v. United States, supra.

lees are not carrying the same property as that on which the initial carrier issued its bill of lading, and because transportation to come under that section must be on a through bill of lading. The factual basis of their argument is that the forwarder issues one bill of lading to the shipper, while the railroad issues a second bill of lading to the forwarder, and that, in the two bills of lading, the named shipments, rates, routes, origins, destinations, consignors and consignees are different.

Carriers at common law were liable for all loss or injury not due to the act of God or public enemy, the inherent nature of the goods, or the act or fault of the shipper.[9] Their strict liability, as insurer, rather than resting on any special contract,[10] grew out of the liability of bailees generally, and is imposed "by operation of law" because of a public policy to protect shippers. This liability could validly be limited by contract or bill of lading, where there was consideration for the limitation, as by a stipulation of value for lower rates.[11] But such contracts, even when supported by consideration, were void and ineffective to relieve a carrier of liability when they were against public policy, as when they attempted to relieve a carrier from the consequences of its own negligence.[12] In most American jurisdictions, however, a carrier was liable only for a loss occurring upon his own lines, and, absent a special contract

or statute, a shipper by connecting carriers could recover at common law only from that one on whose lines the loss occurred (although a carrier could contract for through carriage and thus extend its liability over the entire route).[13] In order to correct the burdensome situation of the shipping public in recovering for losses in interstate shipments over connecting carriers,[14] Congress passed the Carmack Amendment, 49 U.S. C.A. § 20(11) and (12). The Act required a common carrier engaged in interstate commerce to issue a receipt or bill of lading for property received, and made the initial carrier liable to the lawful holder of a bill of lading for any loss, damage or injury to the property caused either by it or by any connecting carrier over whose lines such property might be carried. But the Amendment was not intended to saddle upon the initial carrier the responsibility for any loss which might occur. Therefore it also reserved to the initial carrier the right to recover from the defaulting connecting carrier any sum which it might be required to pay the shipper.

The effect of the Amendment was therefore not to change the liability of carriers, but to provide a new remedy for shippers. It denied the initial carrier the right to limit its own liability to carriage over its own lines, and it made connecting carriers the agents of the initial carrier.[15] But, as between initial and connecting carriers, it

[9] New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. 344, 381, 12 L.Ed. 465; Inland Waterways Corp. v. Hallet & Carey Co., 8 Cir., 52 F.2d 13; II Kent, Commentaries 597 (14th Ed.); Holmes, The Common Law, 180-205; 13 C.J.S., Carriers, § 71.

[10] Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 205, 31 S.Ct. 164, 55 L.Ed. 167, 31 L.R.A.,N.S., 7 Holmes, loc. cit., supra.

[11] Union Pac. R. Co. v. Burke, 255 U. S. 317, 321, 41 S.Ct. 283, 65 L.Ed. 656; Southeastern Express Co. v. Pastime Amusement Co., 299 U.S. 28, 57 S.Ct. 73, 81 L.Ed. 20; Hart v. Pennsylvania R. Co., 112 U.S. 331, 341, 5 S.Ct. 151, 28 L. Ed. 717.

[12] The Ansaldo San Giorgio I. v. Rheinstrom Bros. Co., 294 U.S. 494, 499, 55 S. Ct. 483, 79 L.Ed. 1016; see Michigan Millers Mut. Fire Ins. Co. v. Canadian N. R. Co., 8 Cir., 152 F.2d 292, 294; Mc-

Nicholas Transfer Co. v. Pennsylvania R. Co., 6 Cir., 154 F.2d 265.

[13] Oregon-Washington Ry. & Nav. Co. v. McGinn, 258 U.S. 409, 413, 42 S.Ct. 332, 66 L.Ed. 689; Inland Waterways Corp. v. Standard Commercial Tobacco Co., 5 Cir., 65 F.2d 715; Vital v. Kerr, 2 Cir., 297 F. 959, 964, certiorari denied sub nom. Bigio v. Kerr, 265 U.S. 592, 44 S.Ct. 637, 68 L.Ed. 1196; Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 197, 31 S.Ct. 164, 55 L.Ed. 167, 31 L.R.A.,N.S., 7.

[14] Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 200, 31 S.Ct. 164, 55 L.Ed. 167, 31 L.R.A.,N.S., 7; Missouri, K. & T. R. Co. v. Ward, 244 U.S. 383, 387, 37 S.Ct. 617, 61 L.Ed. 1213; Georgia, F. & A. R. Co. v. Blish Milling Co., 241 U.S. 190, 196, 36 S.Ct. 541, 60 L.Ed. 948; I Roberts, Federal Liability of Carriers, 2d Ed., 685, 686.

[15] Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 196, 201, 31 S.

expressly left the loss to fall on the carrier primarily responsible, by subrogating the initial carrier, forced to pay a shipper's claim, to whatever right that shipper had against the defaulting carrier at common law, and by leaving untouched the shipper's common-law rights against the defaulting carrier.[16]

If it is borne in mind that the purpose of the Carmack Amendment was to protect shippers, and that for the purposes of Section 1013 which extended its provisions to freight forwarders, the latter are to be considered initial carriers and not shippers, we think the appellees' objection that they are not connecting carriers cannot be sustained. It seems apparent that nothing in the legislative history of either Act was intended to deprive the individual shippers of their common-law right of recovery against railroads as intermediate carriers.[17] Before the enactment of section 1013, where goods were shipped through a forwarder, the courts allowed the shippers to recover directly from the carrier.[18] It is true that the courts based recovery on the undisclosed principal theory of agency, and that when a forwarder is considered an initial carrier under section 1013, the agency relationship of shipper and forwarder no longer exists. Nevertheless, we do not think that section was designed to abrogate that right. Since the right did exist for the individual shipper, we think the effect of the Carmack Amendment was to subrogate the freight forwarder, as for this purpose the initial carrier, to that right.

The fact that the shipments given to the forwarder are consolidated by it and sent on by a railroad under another bill of lading would not be sufficient, we believe, to relieve the carrier of liability to the shipper. For the shipper, the goods are the same, whether transported under the same bill or another.

If the shipper by freight forwarder lost his rights against the actual carrier, and the forwarder were thus deprived of his rights of subrogation, it would put the forwarder in a position of an insurer for the entire transportation of the goods. We would require a clearer showing to hold that, because of the circumstance of the use of two bills

---

Ct. 164, 55 L.Ed. 167, 31 L.R.A.,N.S., 7; Northern Pac. R. Co. v. Wall, 241 U.S. 87, 36 S.Ct. 493, 60 L.Ed. 905; Texas & P. R. Co. v. Leatherwood, 250 U.S. 478, 480, 39 S.Ct. 517, 63 L.Ed. 1096.

[16] Georgia, F. & A. R. Co. v. Blish Milling Co., 241 U.S. 190, 36 S.Ct. 541, 60 L. Ed. 948; Chicago & Northwestern R. Co. v. C. C. Whitnack Produce Co., 258 U.S. 369, 374, 42 S.Ct. 328, 66 L.Ed. 665; Pennsylvania R. Co. v. Musante-Phillips, Inc., D.C.Cal., 42 F.Supp. 340.

[17] With respect to section 1013, the House Committee Report, H.R. 1172, 77th Cong., 1st Sess., stated: "This section makes the provisions of section 20 (11) and (12) of the Interstate Commerce Act applicable with respect to freight forwarders. The effect of this bill will be to require freight forwarders to give their customers a bill of lading covering the service performed by the freight forwarder, under which the freight forwarder will assume liability for the movement of property from point of origin to point of destination * * * but in case the loss of or damage to the property transported occurs on the line of a carrier whose service the freight forwarder utilizes, the freight forwarder will have the right to subrogation against the carrier under section 20(12)."

Against this appellees cite a statement made subsequent to the Report of the Committee by Rep. Wolverton on the floor of the House while explaining the bill, 87 Cong. Rec. Pt. 8, p. 8220: "If damage to a shipment occurs on the line of a common carrier whose services are being utilized by the forwarder, the forwarder has no right to subrogation under section 20(12), since its own shipper never had any right of action against such carrier." We think that Rep. Wolverton's premise, i.e., that the shipper would have no cause of action against the carrier, was in error, and therefore his conclusion was unsound. We do not think, therefore, that an interpretation of the Act can be based upon it, especially as he was not Chairman of the Committee.

[18] See Great Northern Ry. Co. v. O'Connor, 232 U.S. 508, 509, 34 S.Ct. 380, 58 L. Ed. 703, where the shipper through a forwarder brought action directly against the railroad and was permitted to recover, though bound by a stipulation of value made by the forwarder as her agent. See also New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. 344, 379-381, 12 L.Ed. 465, where a bank shipped through a person who performed the functions of what today is a forwarder, and was permitted to recover directly from the carrier under the doctrine of the theory of undisclosed principal.

of lading by freight forwarders, Congress intended, by incorporating the Carmack Amendment into the legislation regulating freight forwarders, to impose an absolute liability on them for through carriage, when no such liability was imposed on other initial carriers by the original amendment. We think the purpose of Section 1013, viewed in the light of the history of the Carmack Amendment itself, was simply to protect shippers through forwarders by giving them the same remedy against the person to whom they delivered their goods that they would have had if they had originally delivered to a railroad. We think that Section 1013 was not intended to change the other policy of the Carmack Amendment, i. e., that the loss, as between carriers, should fall on the one responsible. We think that, despite the issuance of a new bill of lading, appellant was subrogated to a right which the original shipper had against the railroads.

■■ 3. Appellees argue that, even if appellant is an initial carrier with subrogation rights under section 1013, that right has been limited, with respect to the time within which claims must be filed, by contract under Section 2(b) of the bill of lading issued by them to the forwarder.[19] We think that argument ignores the terms of the bill of lading on which it rests. Assuming, without deciding the point, that the railroad's bill of lading could control the right to which appellant has been subrogated, we observe that the indicated section provides merely that claims "must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss * * * occurred * * *" This bill of lading is to be construed as consistent with section 1013, under which the case arises. For the

purposes of that section we have already held that the forwarder is the initial carrier, which is the same as the receiving carrier. Notice to it by the shipper, will, then, satisfy section 2(b) of the bill of lading of the railroad, as it satisfies the purpose of that section, namely, that of avoiding undue delay in filing claims.

Reversed and remanded.

---

[19] Section 2(b) of the Uniform Bill of Lading reads: "As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after the delivery of the property (or in case of export traffic, within nine months after delivery at port of export), or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed, and suits shall be instituted against any carrier only within two years and one day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice. Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid."