Williams, Judge,
delivered the opinion of the court:
On various dates in 1923, 1924, 1925, 1926, 1927, and 1928, from and after April 13, 1923, and up to and including July 11, 1928, plaintiff sold to defendant pursuant to numerous contracts with, and different orders by, the defendant, aluminum materials and products which were from time to time delivered as requested by the defendant and which were thereupon invoiced by the plaintiff at the various prices therein stated, amounting in the aggregate to $645,326.35. All the items making up the foregoing aggregate amount have been approved by the bureau, office, or agency of the defendant concerned and have been allowed by the Comptroller General as the correct amount chargeable in favor of plaintiff against the defendant on account of the materials and products so sold and delivered. These items, all admittedly due the plaintiff, have not been paid for the reason that the Comptroller General, to whom the plaintiff’s claims were transmitted for direct settlement, withheld payment on the grounds that such amounts should be set off against an alleged indebtedness of plaintiff to the defendant growing-out of other transactions.
In the construction of Fleet Airship No. 1, pursuant to a contract between the plaintiff and the defendant, the plaintiff incurred extra costs and expenses under the authority of the defendant’s representatives, for which the defendant, through its representatives, has allowed and agreed to pay the amount of $37,262.38. After the approval of this amount by the department concerned, the claim ivas transmitted to the Comptroller General, who certified that the amount was due plaintiff but withheld payment pending the determination of certain claims of the United States against plaintiff company under other contracts.
The case is being tried on plaintiff’s second amended petition filed on May 3, 1933, the first amended petition having-been filed July 15, 1932. Plaintiff’s claim on account of aluminum products delivered to the defendant under various orders and contracts between 1923 and 1928, as alleged in the *127 first and second amended petitions, contained five items which were not included in the original petition filed by plaintiff December 21, 1928, aggregating $1,409.32. These items were invoiced by plaintiff to the defendant between April 21, 1924, and April 22, 1925. The defendant raises a jurisdictional question as to these items of the claim contending that they were barred when first asserted by the plaintiff, the six-year statute of limitations having run against them. The defendant’s contention as to these items is sustained, and plaintiff’s claim on account of aluminum products delivered to the defendant, cognizable by the court, is reduced to $643,917.03, which amount, plus $37,262.38 for materials delivered for Fleet Airship No. 1, makes the total sum due plaintiff on its principal claim $681,179.41, which it is clearly entitled to recover.
The plaintiff denies that it was indebted to the United States in any amount at the time the amounts due it on the various items of the claim were withheld by the defendant and applied to the payment of such alleged indebtedness. It claims that in these circumstances it is entitled to recover interest at the rate of six percent on the amounts of the several items making up the total claim, from the dates such amounts were withheld by the defendant. The claim for interest is based on the act of March 3, 1875, 18 Stat. 481, U. S. C. A., Title 31, Section 227. In order to facilitate the presentation of this issue to the court and avoid the necessity of presenting detailed information on all the numerous items included in plaintiff’s account the parties have stipulated with respect to 25 items selécted by the parties as typical of the items included in the accounts (Finding 7), and have further stipulated that in the event the court should find that plaintiff is entitled to interest on any or all the items contained in the accounts, the material facts will be obtained by the parties and a computation made in accordance with the direction of the court showing the total amount, if any, due, and submit it to the court for entry of judgment thereon.
The act of March 3, 1875, has been applied by this court in numerous cases coming before it. R. J. Reynolds Tobacco Co. v. United States, 82 C. Cls. 545; Mohawk Condensed Milk Co. v. United States, 70 C. Cls. 671; Lloyd- *128 Smith, Receiver for Willys Corporation v. United States, 71 C. Cls. 74; Standard Dredging Co. v. United States, 71 C. Cls. 218; Briggs & Turivas, Inc., v. United States, 72 C. Cls. 674; Helvetia Milk Condensing Co. v. United States, 74 C. Cls. 142, 470; Whitbeck v. United States, 77 C. Cls. 309; Chicago, Indianapolis & Louisville Ry. Co. v. United States, 78 C. Cls. 96. It was held in these cases that claimants in circumstances similar to those in the instant case were entitled to payment of interest. It is therefore held that the plaintiff is entitled to interest on the amounts of the several items making up its account, where it is shown that the plaintiff was not indebted to the United States at the time payment of the amounts was withheld by the defendant.
The plaintiff is entitled to recover the sum of $681,179.41 •on the various items asserted in its petition, plus interest in .such amount as may be due it, computed in the manner just .stated.
COUNTERCLAIM
The Government has filed a counterclaim in which it as.serts the plaintiff is indebted to the defendant in the amount of $1,540,473.57, which amount it seeks to establish as an offset, among other things, to the amount which is otherwise due plaintiff under the principal issue heretofore decided. A voluminous record in support of the counterclaim has been submitted consisting of thousands of pages of testimony and a very large number of exhibits. Because of the earnestness with which the claim has been urged and the very able and exhaustive briefs which have been filed by •counsel for defendant, we have made detailed findings with respect to the major and subsidiary questions presented. :Since these findings set out the facts in a most complete manner, we shall not repeat them except as may be necessary in order to make clear the reasons which underlie our ultimate conclusion. The basis of the counterclaim is that •during the World War plaintiff furnished aluminum to the Government under contracts (referred to herein as “direct orders”), and also to other parties under contracts (herein referred to as “indirect orders”) which other parties used the aluminum in the manufacture and the furnishing of materials to the defendant for the prosecution of the war, and *129 that as a result of these dealings between plaintiff and defendant and the outside parties, plaintiff has failed to give to the defendant the full benefit, to the extent of the amount of the counterclaim, of a unit price for aluminum which was finally agreed upon and announced by the President, on March 2, 1918.
The announcement of the President of March 2, 1918, with respect to the agreed fixed price read, insofar as here material, as follows:
After investigation by the Federal Trade Commission as to the cost of production, the President has approved an agreement made by the War Industries Board with the producers of aluminum fixing a maximum base price of 32$ per pound at the .various American plants, and their subsidiaries, subject to revision on June 1st, 1918;. such price to cover lots of 50 tons and over of ingot of a grade 98 to 99%. The differentials now in force for the sundry grades, quantities, and shapes will continue in force for new contracts. Deliveries on “indirect Government orders” to parties who now have contracts, with the company producing aluminum at a base price in excess of 32$ a pound shall be under such contracts, but the purchasing Government, on satisfactory proof that such amount has been delivered, shall get the benefit of a rebate amounting to the difference between the price such parties would be entitled to at a 32-cent base price and the contract price for the net weight of aluminum delivered to the Government plus the weight of the necessary and proper amount of scrap.
Deliveries which have been made on direct or indirect-orders subject to adjustments shall be adjusted to the 32-cent basis.
The agreement had been consummated as a result of air understanding reached on September 24, 1917, between plaintiff’s president and a representative of the War Industries Board to the effect that plaintiff would accept direct and indirect Government orders for aluminum at the then current contract price of 38 cents a pound, on the condition that, after appropriate investigation and consideration, a, fair price would be fixed, and that, in the event such fixed price was less than 38 cents, plaintiff would refund the difference in amount which would result from an application of the fixed price in lieu of the price of 38 cents which was to> prevail pending the determination of the fixed price. At. *130 the time the understanding of September 24, 1917, was reached plaintiff had outstanding various contracts with Government contractors and subcontractors (indirect orders) for supplying aluminum at approximately 37 and 38 cents per pound. Deliveries wTere made from time to time by plaintiff on these indirect orders after September 24, 1917, and the material was billed at the prices specified in those orders.
After the price of 32 cents was fixed, as indicated above, plaintiff refused, among other things, to make refund on account of indirect orders entered into prior to September 24, 1917, on account of which deliveries were made after that date, on the ground that the agreement between it and the defendant, with respect to which the President made his announcement on March 2, 1918, and referred to above, did not contemplate or require the making of a refund on deliveries made under such contracts, whereas defendant took the position that deliveries made after that date, regardless of when the contracts were entered into, were subject to the refund adjustment. Of the entire counterclaim set up; by defendant, $942,277.14 is claimed to be due on account of these indirect orders which had already been entered into on September 24, 1917, between plaintiff and so-called outside parties. While some differences exist between the parties with respect to the other items in the counterclaim, to which we shall refer later, the real and principal question presented is whether the agreement as to a refund on account of the fixed price applies to indirect orders entered into prior to September 24,1917.
A brief statement of the condition which arose at the beginning of the war with respect to the supply of materials required for its prosecution and the fixing of prices therefor forms an appropriate background for a discussion of the question at issue. Even before war was declared, and increasing as the war progressed, the need for certain basic materials was ever before those charged with the prosecution of the war. One of the basic materials which came up for early consideration was aluminum, the source of supply for which was recognized by defendant’s representatives as being controlled by plaintiff and its related companies. Be *131 cause of the need which existed for aluminum and in response to such a need, plaintiff’s president on April 20, 1917, offered to supply to the Government 8,000,000 pounds of aluminum at 27% cents per pound. At that time the open market price for aluminum was approximately 60 cents per pound, though plaintiff’s president stated that it was being produced at a cost of approximately 25% cents. The offer at 27% cents per pound was accepted, the material was furnished, and is not involved in this controversy. However, over the intervening period from April to September 1917, as the demands for war materials, including aluminum, increased and as the amount covered by the original order for 8,000,000 pounds was becoming exhausted, it became necessary to make other arrangements with plaintiff for the securing of additional quantities. During that period plaintiff had been entering into contracts with outside parties, who, in turn, had contracts with the Government, under which plaintiff was furnishing aluminum at various prices mentioned in contracts entered into between plaintiff and these contractors, and these contractors were, in turn, furnishing munitions and supplies of various types to the defendant for the prosecution of the war, a component part of which was aluminum secured from plaintiff under the foregoing so-called indirect orders.
In the meantime, in response to the increasing need for war materials, defendant set up various agencies to assist in and coordinate purchases of necessary commodities. One agency so formed was the War Industries Board, which we will refer to herein for convenience under that name even though it was reorganized and assumed somewhat different designations and duties from time to time as the war progressed, since we do not regard these changes as material to our present issue. One of the early problems which came up for consideration by the Board as well as by other agencies, and by the President, was the most appropriate method of securing war supplies. The method adopted, insofar as certain basic commodities (including aluminum) were concerned, was to proceed by negotiating with the producers for voluntary agreements for furnishing their product, subject to final determination by the Board and approval by the President, at *132 a fixed price, after investigation by the Federal Trade Commission of the cost of producing such, commodities. In seeking to arrive at a “fixed price” the Board endeavored to* make that term conform to a “just price” as defined by President Wilson shortly prior to the organization* of the Board when he said:
By a just price I mean a price which will sustain the industries concerned in a high state of efficiency, provide a living for those who conduct them, enable them to pay good wages, and make possible expansions of their enterprises which will from time to time become necessary as the stupendous undertakings of this great war develop.
As a result of that policy materials were obtained at agreed prices as a result of negotiations between the defendant and the producers without resort to the commandeering process. The extent to which this voluntary negotiation process was followed and the success met with in its use are well shown by an answer given by one of defendant’s witnesses, who was most closely associated with the operations of the Board, when he was asked what other method was resorted to where a fair price could not be agreed upon, and his reply was “There always was a price agreed to.” It was further stated by the same witness that quite a point was always made in connection with the purchasing activities of the War Industries Board that the prices were on the basis of voluntary agreements.
The facts just stated should be borne in mind as an aid to our understanding of the answer to the question involved. That these were voluntary agreements also answers much that is said in defendant’s brief as to the broad powers of the President and others in authority to secure materials, fix prices, and do many other things which might be necessary in order to carry on war. What might have been done under the circumstances is not our question. Neither plaintiff’s plant nor its product was taken by the commandeering process or in any manner which partook of compulsion. On the contrary, defendant’s witnesses testified uniformly to the splendid cooperation shown by plaintiff and its representatives, particularly its president in seeing to it that its product was furnished and on terms satisfactory to the Government. As typical of the evidence presented on plaintiff’s *133 cooperative attitude, we have a letter written by the Chairman of the War Industries Board to plaintiff’s president shortly after the conclusion of the war, as follows:
As Chairman of the War Industries Board, I wish to express my thanks to you and your Company for the invaluable, efficient and patriotic service rendered during the war in cooperation with Mr. Yeatman and me, in handling the production and distribution of aluminum and the many problems that have arisen in the industry.
The country at large owes you a debt of gratitude.
Whatever may have been the powers of the President and others in authority during the great emergency (and we would not minimize them in the slightest), a discussion thereof is both unnecessary and beside the point for the reason that we are merely seeking to ascertain the terms of an agreement voluntarily entered into by the parties.
Proof as to what actually occurred in the negotiations is made difficult by the fact that this controversy arose years after the conclusion of the war and many of the witnesses were called upon to testify more than 15 years after the particular events had taken place. Another factor is that many things occurred which were not reduced to writing and which were carried out in the most informal manner. However, when we reflect on the stress of war conditions and the enormity of the task which faced those charged with responsibility of securing war supplies, a situation of that kind was only to be expected. Fortunately, however, sufficient documentary evidence was made and has been preserved and the memories of those intimately connected with what happened are sufficiently clear and reveal such a consistent understanding of what happened that the conclusion which we have reached seems inescapable. We make these statements for the reason that much is said in defendant’s brief and many objections were raised during the progress of the hearings for the taking of proof as to reliance being placed oh statements by plaintiff’s witnesses without appropriate confirmation from defendant’s representatives who took part in the same transactions. In short, our conclusion is amply supported by the testimony of defendant’s own witnesses and properly authenticated documentary evidence.
*134 The negotiations with which we are concerned began about the early part of September 1917 when, in pursuance of the policy heretofore referred to of negotiating voluntary agreements, representatives of the War Industries Board discussed with plaintiff’s president the question of an agreement under which aluminum would be furnished by plaintiff for war purposes. At that time the 8,000,000 pounds covered by the first arrangement with plaintiff was becoming exhausted. The extent of the negotiations between plaintiff and defendant is not fully shown from the record, though it is clear that on September 24, 1917, a properly constituted representative of the War Industries Board met with plaintiff’s president and reached an understanding that plaintiff would accept direct and indirect Government orders for aluminum at the current contract base price of 38 cents, with the understanding that after appropriate investigation and consideration a fair price would be fixed, and that, in the event such fixed price was less than 38 cents, plaintiff would make refund of the difference between the two prices.
This was not a contract between plaintiff and defendant, nor did it fix the price at which aluminum was to be supplied by plaintiff to defendant and outside parties. The fixing of the price and the consummation of the voluntary agreement did not take place, and were not intended to take place, until after further information had been obtained and until after final consideration by the War Industries Board and the President. The voluntary agreement between the War Industries Board and plaintiff was consummated about February 28, 1918, and it was approved and announced by the President March 2, 1918. The point to be remembered and to be stressed on account of this understanding of September 24, 1917, is that what the War Industries Board sought to accomplish was to reach an agreement based upon the understanding reached between its representative and plaintiff’s representative on September 24, 1917. We think, without question, that that understanding with respect to indirect orders was that plaintiff would thereafter accept indirect orders at a certain price and that after a fixed price had been agreed upon, appro *135 priate adjustment would be made for any difference that might exist between the prices at which contracts were entered into and the price ultimately agreed upon between plaintiff and the Board and approved and announced by the President, and that such understanding did not contemplate or require any refund adjustment on account of indirect orders which were already in existence on September 24, 1917. Since this is the real crux of the question before us, we shall set out some of the reasons for the conclusion we have reached; namely, that what this understanding contemplated was an adjustment of the fixed price only on account of indirect orders entered into after September 24, 1917, and the further conclusion that what the War Industries Board and the President did in fixing the price was to carry into effect that principle.
Plaintiff’s president testified unequivocally that such was his understanding of the situation, and in support thereof offered documentary evidence in the form of instructions given concurrently to his subordinates showing a contemporary interpretation and understanding of what was to be done. Unfortunately the representative of the War Industries Board who participated in the early negotiations was unable to recall any of the circumstances connected with the transaction. However, the Chairman of the War Industries Board testified that it was never the policy of that Board in its price-fixing arrangements to affect or modify existing contracts except in cases where the Board considered such contracts of an unconscionable nature, and that no contracts which plaintiff had were ever considered of that character. In other words, it is clear from the testimony of this witness that it was never the intention of the Board to extend the arrangement between plaintiff’s representative and the representative of the War. Industries Board, agreed to on September 24, 1917, to contracts which were already in existence on that date.
Subsequent to September 24, 1917, the Federal Trade Commission submitted its report to the War Industries Board on the cost of producing aluminum and thereafter conferences followed between plaintiff and the Board look *136 ing to the consummation of the voluntary agreement as to a fair price for aluminum. Plaintiff’s president participated in these conferences, and in February, 1918, an agreement was reached between the parties that the price should be 32 cents per pound. February 28, 1918, the War Industries Board forwarded a letter to the President outlining its conclusions and inclosing a form of statement which it was recommended should be issued by the President showing the fixed price. The statement was approved by the President March 2, 1918, and released through the public press March 4, 1918. No representative of plaintiff participated in the preparation of that statement, which provided, among other things, as heretofore stated, that—
* * * Deliveries on “indirect Government orders” to parties who now have contracts with the company producing aluminum at a base price in excess of 32 cents a pound shall be under such contracts, but the purchasing Government, on satisfactory proof that such amount has been delivered, shall get the benefit of a rebate amounting to the difference between the price such parties would be entitled to at a 32-cent base price and the contract price for the net weight of aluminum delivered to the Government plus the weight of the necessary and proper amount of scrap.
Deliveries which have been made on direct or indirect orders subject to adjustments shall be adjusted to the 32-cent basis.
Admittedly, from the statements just quoted, without more, there is ground for defendant’s position that the agreement covered deliveries made on indirect contracts regardless of when entered into and much emphasis is placed by defendant on this phase of the President’s price-fixing statement. However, it shoidd be noted that even in this statement there is a measure of ambiguity in that in the second sentence quoted there is the phrase “indirect orders subject to adjustments,” which certainly shows that a blanket inclusion of all orders was not intended. It should be remembered, however, that this statement was prepared by the War Industries Board and that plaintiff, the other party to the agreement, did not know of its wording until after it was released. When the announcement by the President *137 •came to the attention of plaintiff’s president the latter issued instructions to his subordinates consistent with the interpretation which we have given to the agreement, and on March 7, 1918, forwarded a copy of those, instructions to the War Industries Board. What, if any action, was taken by the Board on the receipt of such instructions or what attention was paid to the communication does not appear, but on April 17, 1918, plaintiff’s president wrote a letter to the War Industries Board explaining in detail his understanding of the agreement reached which formed the basis of the President’s announcement and calling specific attention to the status of contracts entered into at various periods, and setting out his understanding that indirect orders entered into prior to September 24, 1917, which contained no provision for adjustment to the fixed price when determined, should not be subject to the agreement entered into between plaintiff and the War Industries Board as to which the President made his announcement on March 2,1918.
After a conference between plaintiff’s president and a representative of the War Industries Board, and after the plaintiff failed to receive a reply to the letter of April 17, 1918, plaintiff’s president wrote the War Industries Board stating that he should be glad to receive its “confirmation ;and acceptance of our conception of the situation as outlined in our letter of April 17.” In reply to that letter a proper representative of the War Industries Board wrote plaintiff May 11, 1918, in which he said, insofar as here ■ material, “I may say that your letter of April 17th is quite satisfactory.”
A further confirmation of the understanding of all parties •of the terms of the agreement is shown by certain events which occurred when the price to be fixed for aluminum again came before the War Industries Board in May 1918. The agreement of March 2, 1918, was then about to expire and after conferences between plaintiff’s representatives and the War Industries Board it was agreed that the price for aluminum should be increased from 32 cents to 33 cents per pound. After an agreement had been reached as to the new price, representatives of plaintiff collaborated with representatives of the War Industries Board in the prepa *138 ration of a statement to be issued governing the fixed price. After the statement had been prepared the Chairman of the section in the War Industries Board under whose supervision aluminum came sent a letter to the Chairman of the Price-Fixing Committee, War Industries Board, with which he transmitted a statement to be issued by the President on account of the fixed price, and made the following statements :
Enclosed find a suggested form of proclamation to be sent to the President for his approval. This proclamation is of necessity more complicated and goes into detail more than in the case of the other metals. Both Mr. Arthur Davis, President of the Aluminum Company of America; his brother, Mr. Edward Davis, and ourselves, have given a great deal of thought and study to it. It is believed that it is a satisfactory form, though apparently rather long and complicated.
In making out the original proclamation on aluminum we had some difficulty, but I believe that this is a much better form than the original one.
One paragraph of the statement to be issued by the President read as follows:
The new prices will be effective on deliveries made during the period from June 1, 1918, to Sept. 1, 1918, on contracts made during said period; and furthermore the new prices will be effective on deliveries made during said period on existing contracts which specify that the price shall be that in force at the time of delivery. Deliveries made during the period June 1,1918, to Sept. 1, 1918, on other contracts shall be at the price stated in such contracts, except that on existing “direct and indirect Government contracts” containing a provision that refund is to be made of the difference between the price stated in the contract and the “Government fixed price, if, as, and when made,” such difference shall be refunded on deliveries made during the period from June 1,1918, to Sept. 1, 1918, on presentation of proper proof that the purchasing Government gets the benefit of the refund.
The statement as prepared was duly transmitted to the President, who returned it on May 28, 1918, with his approval and it was made public on the same day. The prices as fixed in the announcement by the President of May 28. *139 1918, continued in effect until September 1, 1918, shortly prior to which date another similar agreement was reached under which the price fixed by the preceding announcement of May 28,1918, was continued in effect until March 1, 1919, The statement as issued by the President was of similar import to that approved on May 28, 1918.
Regardless of the above considerations, including the unequivocal testimony of plaintiff’s president as to the agreement reached and its contemporaneous interpretation by plaintiff’s officers, as shown by documentary evidence, the interpretation given to the voluntary agreement when the statement in regard thereto was issued by the President and the unqualified acceptance of such interpretation by defendant’s officers, and a further interpretation given when the second announcement of the President was prepared, all showing clearly that the voluntary agreement was inapplicable to indirect orders which were in existence on September 24,1917, defendant nevertheless contends that there was in any event an account stated which arose in favor of the defendant for the amount shown in the counterclaim by reason of a joint audit which was prepared by the parties. Again we disagree. What constitutes an account stated has been before the courts on many occasions and it is unquestionably well established that an account stated not only contemplates an admission by the debtor that a liability does exist but also that the amount owing is as stated in the account, together with a promise, either express or implied, on the part of the party owing the money, for the payment of the amount stated. In referring to some of the elements of an account stated we said in Shipley Construction Co. v. United States, 79 C. Cls. 736.
* * * In the case of David Daube v. United States, 75 C. Cls. 633, affirmed 289 U. S. 367, the opinion (pages 643-645) recited the nature of transactions which have been held to constitute an account stated. Among other matters it is held that where a fixed sum is admitted by one party to be due the other and there is a promise, express or implied, for the payment of this amount, an account stated is rendered. To this statement the other party must assent, but it is not necessary in such cases that the assent be given in writing or by any kind *140 of direct communication. It may be inferred from all of the circumstances of the case. Cf. United States v. Kaufman, 96 U. S. 567; United States v. Savings Bank, 104 U. S. 728, in which there was no evidence of assent except as it would be naturally inferred under the circumstances. * * *
In view of this statement of the law it is hard to understand how it can be contended that an account stated arose in this case. What occurred was that at or about the termination of the war certain representatives of the Government came to the conclusion that an investigation should be made with the view of determining whether the Government had gotten the full benefit of all the adjustments to which it was entitled on account of the price-fixing arrangement with respect to aluminum, heretofore referred to. An investigation was accordingly begun by defendant’s agents which ultimately terminated in the preparation of what we have referred to in our findings as a “preliminary audit,” and showed an amount claimed to be due from plaintiff of approximately $2,300,000. Plaintiff denied liability on account of the amount claimed and thereafter conferences were had between plaintiff and defendant with respect to the contested liability. The controversy culminated in a conference held on October 6, 1923, at which time plaintiff denied liability, but agreed, perhaps in part at its own suggestion, to join with the defendant in making an audit which would more clearly define the issues presented in the claim of the Government under the “preliminary audit” by establishing certain facts necessary to a consideration of the claim, such as terms of contracts involved, tonnage delivered thereunder, dates of delivery, and other similar factors, and setting up the various items and classes in such a manner that more intelligent consideration could be had of the issues involved. The joint audit was carried out in accordance with that understanding and resulted in fixing the amount of defendant’s claim as now shown in its counterclaim. However, we can find nothing which would indicate an admission by plaintiff that the results of the audit were to constitute an admitted liability on its part. If there could be any doubt as to the position of plaintiff at *141 the time the audit was undertaken, it is certainly dispelled by defendant’s own exhibit, which is the conference report of the officer who presided at the time the conference was held when the joint audit was agreed upon. In that report defendant’s officer stated:
The Aluminum Company took the position that it had taken heretofore in that it admitted no liability on the part of said company to the United States.
After the audit had been completed plaintiff wrote defendant in regard thereto, in part, as follows:
We will be glad to discuss this matter with you and your associates at any time that may suit your convenience, but, in the meantime, you will, of course, understand that it is the position of the Aluminum Company of America that it is not indebted to the United States Government in any sum whatever upon the claim of May 2,1923, or upon any item shown by the above mentioned statement [Joint Audit].
Later, when defendant made formal demand on plaintiff for the amount shown therein, which is the amount of the counterclaim, plaintiff again denied liability except as to an immaterial amount for which a check! was tendered.
Under such circumstances there was not only no amount admitted by plaintiff as due defendant, and no promise, express or implied, on the part of plaintiff to pay the amount stated, but also there was an express denial by plaintiff that such amount was due. In the case of Daube v. United States, 289 U. S. 367, the court, in discussing a claim with respect to an account stated, said: “The transaction never went beyond the stage of intra-departmental conference and parley.” In the case at bar the transaction did not get beyond the “conference and parley” stage, in that all that had occurred was defendant claimed an amount due from plaintiff, plaintiff denied liability and the parties engaged in conferences and parleys and took certain preliminary action looking to further consideration of the matter, but the parties at no time reached an agreement from which it is possible to spell out an account stated.
In view of the above considerations defendant’s counterclaim, to the extent that it seeks to include refunds on *142 account of indirect orders which were entered into prior to September 24, 1917, and amounts to $942,277.14, is denied. This leaves an amount of approximately $600,000, as to which, as we understand the situation, there is now no question being raised on the part of the plaintiff other than as to whether all of the aluminum which gives rise to this amount was in fact used for war purposes by parties receiving it or whether it was purchased and used on commercial work. During the hearings, when proof was being offered by the parties, some evidence was offered in the cases of specific contracts, showing use made of such material. However, when it appeared that there were some 400 contracts involved and that the taking of proof with respect to specific use in all of these instances would entail considerable expense and consume much time, much of which would become immaterial in the event it should be held that the fixed price was inapplicable to some of these contracts, the case was submitted without a full showing as to specific use, with the reservation that after decision had been had on the questions now presented, opportunity would be given to both parties to present further evidence on the “use” issue. It should be observed, however, that much proof was received on the general aspects of this issue which leaves little room for doubt that at least the greater part of this material was used for war purposes. Such proof included the early recognition of the need for aluminum for war purposes, the source of supply as limited to plaintiff and its related companies and the measures which were taken by defendant to enable plaintiff to meet the war needs for its product, the requirement for the use of priority orders for this product before; shipments could be had, the large amount claimed and allowed plaintiff for amortization as a deduction in its income and profits tax returns for the war years on the ground that its facilities were devoted to war purposes, and other material facts. In view, however, of the reservation as to the opportunity for a further showing on this issue, the entry of judgment in favor of plaintiff for the amount which we have held to be due on its claim, after appropriate offset on account of the counterclaim, is suspended and the *143 case will be referred to a commissioner for the taking of further proof, in the event the parties are unable to agree on the amount due as the balance of the counterclaim.
Littleton, Judge; Green, Judge; and Booth, Chief Justice, concur.
Whaley, Judge, dissents.