**RECONSTRUCTION FINANCE CORP.**

v.

**COMMERCIAL UNION OF AMERICA CORP.**

**COMMERCIAL UNION OF AMERICA CORP.**

v.

**RECONSTRUCTION FINANCE CORP.**

United States District Court,
S. D. New York.

March 25, 1954.

On the Merits.

April 16, 1954.

C. R. L. Hemmersley, Montclair, N. J., for Reconstruction Finance Corporation, by A. Glaser, of counsel.

Alexander D. Diamond, New York City, for Commercial Union of America Corp.

GODDARD, District Judge.

Motion by Commercial Union on March 18th to reopen the case to take the testimony of O'Halloran, an employee of the Foreign Economic Administration and United States Commercial Company at the time of the transaction. He was not called at the trial.

The Reconstruction Finance Corporation filed its suit on April 13, 1949, and Commercial Union filed its action on June 26, 1952. Several pretrial conferences were held from December, 1952 to June, 1953, at which numerous documents were marked for identification, some of which were authored by O'Halloran. The trial

began on January 12, 1954, and ran for four days, ending on January 15th, during which no application for an adjournment was made. Briefs were filed by both sides on February 15, and 17th. Now Commercial Union seeks to reopen the case. It has not been shown that O'Halloran was unavailable previously nor that any attempt to locate him was ever made until now.

After a case has been closed, whether or not it should be reopened is within the sound discretion of the trial court. Philadelphia & Trenton R. R. Co. v. Stimpson, 14 Pet. 448, 39 U.S. 448, 10 L.Ed. 535. Though it may be permitted in a proper case, it has been called a "pernicious practice". Missouri Pac. Ry. Co. v. Oleson, 8 Cir., 213 F. 329. Where a party has not shown diligence in procuring a witness, the reopening of the case may be denied. Cincinnati, N. O. & T. Ry. Co. v. Cox, 6 Cir., 143 F. 110.

I do not think that Commercial Union has been properly diligent in obtaining this witness, and I deny the motion to reopen the case.

Settle order on notice.

### On the Merits.

The Reconstruction Finance Corporation [hereinafter referred to as the R. F.C.] filed its suit for breach of contract against the Commercial Union of America Corporation [hereinafter referred to as Commercial Union] on April 13, 1949, to which Commercial Union filed its answer. Subsequently, on June 26, 1952, Commercial Union filed a complaint against the R.F.C. for failure to pay an alleged account stated. To this complaint R.F.C. filed an answer and counterclaimed in this suit for the same damages which were the subject of its own suit.

Since both suits arise out of the same transaction, the purchase and sale of certain garbanzos [Mexican chickpeas], Commercial Union's claim should have been asserted as a counterclaim in the action by the R.F.C., not in an independent action. cf. Rule 13(a), Fed.

Rules Civ.Proc. 28 U.S.C.A. However, both suits have been consolidated for trial, and I shall overlook this error in procedure.

The R.F.C. sues for the increased amount agreed by Commercial Union to be paid over the original purchase price for the garbanzos, less certain credits to be allowed to Commercial Union. Commercial Union denies liability on the amended contract, charging duress in obtaining its acceptance. Commercial Union in its suit alleges an account stated between itself and the United States Commercial Company [hereinafter referred to as the U.S.C.C.] allegedly entered into on August 13, 1946, wherein it claims that the U.S.C.C. agreed to pay Commercial Union for certain expenses incurred by Commercial Union subsequent to the purchase of the garbanzos. The expenses involved therein are the same items for which the R.F.C. would allow credits against its claim, but the amounts are in dispute. The R.F.C. denies that there was an account stated.

The R.F.C. sues, and is sued, as the statutory transferee of the capital stock, assets and liabilities of the U.S.C.C., pursuant to Executive Order No. 9630, 50 U.S.C.A.Appendix, § 601 note (10 F.R. 12245).

On January 10, 1945, Commercial Union sent a telegram to J. A. O'Halloran of the Foreign Economic Administration [hereinafter referred to as the F.E. A.], of which the U.S.C.C. was a part, offering to buy garbanzos, stating:

" * * * We are anxious to secure 7,000 tons or part of same and we hereby offer your firm hundred and ten dollars per metric ton F.O. B., New Orleans stop for your information above material is intended for shipment to Spain."

On January 19, 1945, O'Halloran replied by telegram:

"Referring your telegram January 10. We accept your bid of $110 per metric ton for approximately 3900 tons Mexican Garbanzos * * *. We are confirming this

with the understanding * * * that the Barbanzos [sic] are intended for shipment to Spain. * * * "

This reply telegram also set forth additional terms of shipment and payment. By letter of January 25, 1945, on F.E.A. letterhead, C. N. Gibboney, Chief of the Food Production and Procurement Division, forwarded three copies of a confirmation of sale, S–11772, for signature by Commercial Union, two signed copies to be returned to the U.S.C.C., Food Production and Procurement Division. This confirmation of sale had the names of the U.S.C.C. and the Commercial Union typed in, and it stated in part:

"This will confirm our sale under the name and date shown above in accordance with the terms and conditions stated herein:"

The number was S–11772 and the date was January 19, 1945. It listed the terms of shipment and payment but made no mention of export or shipment to Spain.

By letter of January 26, 1945, addressed to the U.S.C.C., Commercial Union returned the two copies of S–11772 duly accepted. By letter of February 21, 1945, Commercial Union forwarded to O'Halloran a cheque for $5,000, drawn to the order of the U.S.C.C., on account of the purchase price. A draft, dated April 18, 1945, was drawn to the order of the U.S.C.C. for the balance of the purchase price, in the amount of $441,-688.28, on the Chemical Bank & Trust Company, and payment was received by the U.S.C.C. on April 24th by cheque drawn to its order.

Meanwhile, between March 28th and April 18th, Commercial Union sold the garbanzos to customers, not in Spain, but in Cuba. It then made application to the F.E.A., the agency in charge of export licensing [Act of Congress July 2, 1940, c. 508, 54 Stat. 714], for licenses to ship to Cuba. All were rejected, save five which were at first validated but then revoked.

On May 7th, O'Halloran wrote to Commercial Union, stating in part:

"This sale was made to you for shipment to Spain. We are now informed by your Mr. Antoniades and Mr. Horgan that you desire to export this quantity of garbanzos to Cuba. It has been determined that an export license cannot be approved for Cuba, however, we recommend that you make immediate application for an export license to Spain. If you are unable to export this merchandise to Spain, we shall repurchase it from you at the same price we sold to you thereby cancelling the contract."

To this, Commercial Union replied on May 12th, in part:

"Our negotiations prior to the purchase, were conducted with the intention of shipping the material in question to Spain. In the meantime, however, developments in connection with the lot in question makes this impossible or at least inadvisable. * * *

"We very much appreciate your offer to repurchase the material, which we cannot reconsider, as it has already been sold."

On July 23, 1945, Commercial Union wrote to Gibboney, stating:

"As advised by us at the time of purchase, this merchandise was intended for shipment to Spain. However, our buyers in Spain informed us that they were not interested at the price, and stated that their ideas of price were considerably below what we paid you for the material. * * *

"Under the circumstances, we have discussed with you the proposal to ship this merchandise to Cuba. We therefore await your advices in this connection."

On July 25th, Gibboney forwarded to Commercial Union a Sale Adjustment 363, in the form of a letter, which said:

"We refer to your letter of July 25, 1945, [sic] regarding the purchase from U. S. Commercial Company of 3900 tons of garbanzos cov-

ered by contract S–11772 dated January 19, 1945.

"In view of the fact that the garbanzos were sold to you specifically for shipment to Spain at a price figured to permit shipment to that country, we understand that you are agreeable to a change in the price to correspond with that given to other companies which have made shipments to Cuba. The price at which these other sales were made is $121.50 per metric ton. We will, therefore, be pleased to amend the above contract to change the price from $110 per metric ton basis to $121.50 per metric ton basis, allowing you for the expenses of storage, insurance, interest and inspection actually paid on these garbanzos by your [sic] from January 29, 1945 to date with an allowance of 30 days free charges. Interest at the rate of 3 percent per annum is to be paid by you on the additional amount due from the date of acceptance until payment is received.

"It is understood that the 3900 tons of garbanzos are committed by you to Cuban purchasers and that export licenses will be approved by Foreign Economic Administration for shipment of the full quantity of these garbanzos to Cuba within 100 days.

"This offer will be deemed accepted on receipt of a copy of this letter signed by an authorized officer of your company, together with a letter from a New York Bank guaranteeing payment of the additional amount due."

This was signed and accepted by Commercial Union and it is this agreement which is the basis of the suit by the R.F.C.

On July 31st, Commercial Union wrote to Gibboney enclosing a letter from the Chemical Bank & Trust Company which guaranteed the payment and stated in part:

"As we understand the situation, the garbanzos were purchased from the U. S. Commercial Company with the intention of shipping to Spain, but, as the price was such that the Spanish buyers were not interested, Commercial Union arranged to make this shipment to Cuba, whereupon the U. S. Commercial Company felt that it should receive a higher price for merchandise going to that market and requested an increase from the original $110 per metric ton to $121.50 * * *

"* * * we shall consider this undertaking to expire as of September 29, 1945, unless we receive written notice to the effect that an extension is necessary.

"We sincerely hope that this will serve your purpose and we should like to take occasion to comment on the fact that our customer is very much impressed with the excellent treatment he has received from you."

Soon thereafter, licenses were validated by the F.E.A. and the garbanzos were shipped to Cuba.

On May 20, 1946, Commercial Union sent to the U.S.C.C. an invoice for allowances of its expenses as provided for in Sale Adjustment 363. It claimed:

| | |
|---|---|
| Storage | $10,021.24 |
| Insurance | 1,975.38 |
| Interest | 5,661.68 |
| Inspection | 6,828.93 |
| Total | $24,487.23 |

By letter of May 28, 1946, the U.S. C.C. requested Commercial Union to send an itemized statement supported by receipted bills to substantiate this claim. Commercial Union sent these. On June 28, 1946, the U.S.C.C. sent a bill to Commercial Union for $44,706.83, the increased purchase price under the amendment to the contract, and allowed

credits in the amount of $21,398.97. It allowed:

| | |
|---|---|
| Storage | $10,021.24 |
| Insurance | 1,849.23 |
| Interest | 5,349.47 |
| Inspection | 4,179.03 |
| Total | $21,398.97 |

The bank guarantee had by this time lapsed.

Subsequently, on August 13, 1946, a representative of the Audit and Review Section of the U.S.C.C., and an officer of Commercial Union signed a memorandum for the Audit and Review Section. It read:

"Charges to U. S. Commercial Company by the Commercial Union of America Corp. in connection with the above sale of chickpeas, covering a total of 77,751 Bags [50 Kilos per bag], substantiated as follows:"

It then listed the expenses claimed, totalling $24,487.23, and concluded:

"We certify to the best of our knowledge and belief that this is a true and correct schedule of charges paid by the Commercial Union of America Corp. in connection with the above sale."

It is this memorandum which is said to be the account stated on which Commercial Union sues.

Commercial Union asserts that the R.F.C. is not the proper party plaintiff and that the suit should have been brought by the United States on behalf of the F.E.A., since it alleges that the contract was with the F.E.A.

The U.S.C.C. was originally organized on March 26, 1942 as a corporate subsidiary of the R.F.C. Its charter gave it the power to buy and sell strategic and critical materials, and to sue and to be sued. (7 F.R. 2426, as amended in 7 F.R. 6704). By the terms of Executive Order No. 9361, U.S.Code Congressional Service 1943, p. 5–62, it was transferred from the R.F.C. to the Office of Economic Warfare (8 F.R. 9861), and subsequently under the provisions of Executive Order No. 9380, U.S.Code Congressional Service 1943, pp. 5–76, the U.S. C.C., its contracts, assets and liabilities were transferred to, and consolidated within, the F.E.A. (8 F.R. 13081).

In January, 1944, President Roosevelt approved a request by the Administrator of the F.E.A. to authorize the U.S.C.C. to exercise such powers as the Administrator delegated to it pursuant to Executive Orders 9380 and 9385, U.S. Code Congressional Service 1943, pp. 5–81. On June 15, 1944, the Administrator authorized it to conduct trade, to purchase materials for export to foreign countries, and to act for the F.E.A. in the development of a food program. Executive Order No. 9630, terminated the F.E.A. and transferred the U.S.C.C. with its functions, capital stock, assets and liabilities to the R.F.C. (10 F.R. 12245).

While the U.S.C.C. was a part of the F.E.A., Gibboney and his subordinate O'Halloran both held official positions in the U.S.C.C. and in the F.E.A. concurrently. The confirmation of sale is in the name of the U.S.C.C. and payment under the contract was made to the U.S.C.C. The amended contract, Sale Adjustment 363, on which the R.F.C. sues, which was accepted and signed by the Commercial Union, states that the garbanzos were purchased "from the U. S. Commercial Company." In addition, the reply of Commercial Union filed by it in its suit, in answer to the R.F.C.'s counterclaim, admits that the contract was with the U.S.C.C. I find that the evidence is clear that the contract was made with the U.S.C.C., and that the U.S.C.C. had the power to so contract, and to sue and be sued. Since Executive Order No. 9630 transferred the assets and liabilities of the U.S.C.C. to the R.F.C., I find that the R.F.C. is the proper party to enforce whatever rights the U.S.C.C. had under the contract.

It is to be noted that the alleged account stated upon which Commercial Union sues the R.F.C., which arose out of this sale of garbanzos, was with the U.S.C.C., not with the F.E.A.

The suit by the R.F.C. is for the increased purchase price, less allowable credits, agreed to be paid by Commercial Union in Sale Adjustment 363. This amendment of the original contract was entered into when Commercial Union insisted upon being allowed to ship the garbanzos to Cuba.

■ Commercial Union concededly purchased these garbanzos for export. There was little or no demand for garbanzos for domestic consumption. When the U.S.C.C. sold them for export, there is no doubt that there was a corresponding obligation resting on the F.E.A., of which the U.S.C.C. was a part, to grant the appropriate export licenses, so long as there was no incapacity to do so. cf. Vanadium Corp. of America v. Fidelity & Deposit Co., 2 Cir., 1947, 159 F.2d 105, at page 108. However, the sale was made on the condition that the garbanzos were to be exported to Spain, and that was the measure of the duty. The F.E.A. did not deny any export licenses for Spain. Though it urged the Commercial Union to make such application, Commercial Union did not do so.

It is true that the confirmation of sale, S–11772, did not refer to the requirement to export to Spain, although it was clearly understood then, and not challenged now, that they were for export.

Commercial Union asserts that the confirmation of sale represents the complete contract between the parties, is complete and unambiguous on its face, and that the telegrams are inadmissible.

■■ It is a well-established rule of law that when a contract has been reduced to writing, and is evidenced by a document, or series of documents, the contents of such documents cannot be varied or contradicted by parol or extrinsic evidence. 32 C.J.S., Evidence, § 851, p. 784. However, the parol evidence rule assumes agreement upon the writing in question as a complete statement of the bargain, that is, as an integration. 3 Williston on Contracts p. 1830. For the purpose of determining this question, all the circumstances of the transaction are relevant and must be considered. Delzell v. Central Public Utility Corp., D.C., 56 F.Supp. 25, at page 28, affirmed, 3 Cir., 143 F.2d 1020.

■■ The exchange of telegrams between the parties, which the confirmation of sale referred to as the sale, (whether the reply telegram was in fact a counter-offer need not be decided) clearly establishes that it was a definite understanding that the garbanzos were sold for shipment to Spain. The confirmation of sale made no mention of export. It obviously was not intended as a complete integration by the parties, and constituted no more than a partial integration of the terms of the contract. Corbin on Contracts states:

" It very often happens that when two parties are trying to integrate their agreement in a writing they omit to state some fundamental assumption on the basis of which, as both of them well know, the agreement is being made, * * * Evidence of the facts tending to show that such a fundamental assumption was made, though not expressed in the writing, should never be excluded by any 'parol evidence rule'." 3 Corbin on Contracts p. 330.

I find that the confirmation of sale was not a complete integration of the terms of the contract, and that the contract entered into between the parties, as appears in the telegrams, was that the garbanzos were sold for export to Spain specifically. Certainly, this was the interpretation placed upon the contract in their subsequent correspondence, and where the interpretation of a contract is not clearly apparent on its face, the interpretation given to it by the parties' acts or declarations may be considered. Vital v. Kerr, 2 Cir., 1924, 297 F. 959, at page 968.

■ As a consequence, any right of Commercial Union to the appropriate export licenses to fulfill the agreement was restricted to licenses for Spain.

■ The amended agreement, Sale Adjustment 363, of July 25, 1945, where-

by Commercial Union agreed to pay the additional price for the garbanzos in consideration of the permission to ship to Cuba, rather than to Spain, on its face is regular and enforceable. However, Commercial Union alleges that it is invalid because of duress and is essentially the illegal sale of export licenses.

The testimony of Gibboney on cross-examination was that it was the policy of the governmental agencies to sell commodities such as these for export at a price in line with the then current price for such commodities in the country of destination. In order to effectuate this overall governmental objective, it was decided that to allow the export of these garbanzos to Cuba, the price for Cuba should be higher since Cuba was a higher price market than Spain, and it should be commensurate with the price at which other such sales were made for Cuba. This was set forth also in the amended contract.

It was certainly permissible for the government agency to require such an amendment of the price paid, in consideration of its consent to change the terms of the contract in order to allow shipment to Cuba. There was no subterfuge and there was no duress applied by the U.S.C.C. In fact, when Commercial Union decided not to ship to Spain, the U.S. C.C. offered to rescind the sale and take back the garbanzos. This offer was rejected. The mere stress of business conditions which may have made shipment to Spain less profitable than to Cuba, does not constitute duress which would void the agreement, particularly where the U.S.C.C. was not responsible for such conditions. Lawrence v. Muter Co., 7 Cir., 1948, 171 F.2d 380, at page 382.

The amendment of July 25, 1945, Sale Adjustment 363, was mutually consented to in writing and Commercial Union is liable under it for the increased purchase price of $44,706.83, less the allowable credits.

As to the allowable credits, under the amended contract, $10,021.24 for storage is agreed upon. Commercial Union claims an allowance of $1,975.38 for insurance, whereas the R.F.C. would allow only $1,849.23. The R.F.C. prorated the insurance premium of $1,975.-38, which was actually paid, to allow only the portion thereof applicable through August 25, 1945, for the agreement provided 30 days free charges beyond July 25th. However, in order to insure the garbanzos at all, the insurance had to be taken out for a period of months. Since it had to be incurred in full in order to insure them through August 25th, I believe the full amount of insurance claimed should be allowed.

Interest caimed by Commercial Union is $5,661.68 and the R.F.C. allows $5,-349.47. Commercial Union computed this figure through August 30th, whereas the agreement provides it would be allowed through August 25th. It was ascertained at the trial that the Commercial Union figure should be reduced by $225, leaving a sum of $5,436.68 allowable for interest.

Inspection expenses claimed by Commercial Union amount to $6,828.93, while the R.F.C. originally allowed $4,179.03. The sum of $2,638.60 was claimed for expenses incurred by a Commercial Union official in Houston, Texas, where the garbanzos were stored, through October, 1945. At the trial, the R.F.C. agreed to allow such expenses through August 25th, amounting to $1,468.87, and a telephone bill of $11.30. This brings the inspection allowance to $5,659.20. The excess claimed is disallowed as not provided for in the agreement.

This brings us to the suit by Commercial Union. It alleges an account stated in the amount of $24,487.23 and constitutes the identical claims for expenses considered above. $23,092.50 of this claim has already been allowed. Commercial Union claims the full amount on the theory that this is a claim for damages for failure to grant the initial applications for export licenses to Cuba, and that the memorandum of August 13, 1946, signed by a member of the Audit and Review Section of the U.S.C.C. is an account stated wherein the U.S.C.C. agreed to pay this entire amount.

An account stated cannot be made to create a liability where none had previously existed. In re Merz, 2 Cir., 1930, 45 F.2d 558; 1 C.J.S., Account Stated, § 14, p. 698. There was never any duty to allow shipment to Cuba prior to the amended agreement of July 25th, and so this refusal could not constitute any breach for which the U.S. C.C., or F.E.A., could be liable. The only valid claim Commercial Union has, is that for the credits agreed to be allowed it in Sale Adjustment 363.

The memorandum of August, 1946, includes claims for expenses clearly beyond what is provided for in the agreement. In fact, the memorandum appears to be nothing more than an audit of the books of the Commercial Union. The auditing of a claim against the government does not ordinarily effect an account stated against it. 1 C.J. S., Account Stated, § 13, p. 698. Where a party joins in an audit, it does not constitute an account stated without some admission, express or implied, that the results thereof should constitute a liability on its part. Aluminum Co. of America v. United States, 87 Ct.Cl. 96, at page 140. For an account stated presupposes an absolute admission of a certain sum due. 1 Am.Jur. p. 277. I can find nothing to indicate such an admission or promise on the part of the U.S.C.C.

Furthermore, in order to bind the U.S. C.C. on the alleged account stated, it must appear that he who acted for it therein was authorized to do so. Riordan v. Ferguson, 2 Cir., 1945, 147 F.2d 983, 1 Am.Jur. p. 278. There is no proof that the representative of the Audit and Review Section of the U.S.C.C., who signed this memorandum, had authority to bind the U.S.C.C. to an account stated.

I hold that this memorandum does not constitute an account stated, and the suit by Commercial Union is dismissed. Since the R.F.C. counterclaim has already been decided in its favor, in the suit by R.F.C., the counterclaim is dismissed.

Judgment may be entered for the R.F. C. in the amount of $44,706.83, less $23,-092.50, or $21,614.33, plus interest thereon at 3 percent from July 25, 1945 to January 15, 1954, the dates agreed on by the parties.

This lengthy opinion covers the facts fully and also the conclusions of law and will serve as findings of fact and conclusions of law.